### NILVA et al. v. UNITED STATES.
### No. 14783.

United States Court of Appeals,
Eighth Circuit.
April 19, 1954.

William P. Murphy, St. Paul, Minn., (John W. Graff, St. Paul, Minn., on the brief), for appellants.

George E. MacKinnon, U. S. Atty., St. Paul, Minn. (Clifford Janes, Asst. U. S. Atty., Redwood Falls, Minn., on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and COLLET, Circuit Judges.

GARDNER, Chief Judge.

Appellants were named as defendants in an indictment containing two counts. Count one charged in substance that defendants Samuel George Nilva, Albert Gardner and the Mayflower Distributing Co., a Minnesota corporation, did knowingly and contrary to the provisions of 15 U.S.C.A. § 1172 by means of motor vehicle transport approximately thirty-eight gambling devices as defined by 15 U.S.C.A. § 1171, namely, approximately thirty-eight slot machines from Davenport, Iowa, and Rock Island, Illinois, to Minneapolis and St. Paul, Minnesota, and that neither the state of Minnesota nor the cities of Minneapolis or St. Paul had or has en-

acted a law providing for the exemption of such state or cities from the provisions of 15 U.S.C.A. § 1172. Count two in substance charged that defendants Samuel George Nilva, Albert Gardner and Herman Paster conspired together and with each other to commit the offense described in count one of the indictment. Count two then charged five overt acts alleged to have been committed in furtherance of the conspiracy so charged.

At all times pertinent to the issues here involved the Mayflower Distributing Co. was a corporation having its place of business in St. Paul, Minnesota, primarily engaged in the business of selling coin-operated amusement devices including slot machines. Herman Paster owned, controlled and operated the Mayflower Distributing Co. and he also owned and operated the Pastor Distributing Co. which was primarily engaged in the sale of automatic phonographs. He seems also to have been engaged in various other businesses. Samuel George Nilva, a brother-in-law of Herman Paster, was employed by the Mayflower Distributing Co. as field manager. Albert Gardner was employed by the Mayflower Distributing Co. as a shipping clerk and truck driver.

There was evidence tending to show that in the latter days of February, 1951, defendant Nilva in company with one Robert Manville went on a business trip for the Mayflower Distributing Co. for the purpose of inspecting machines on location in Iowa and Illinois and relative to the renegotiation of contracts for the sale of certain machines. He ultimately went to Davenport, Iowa, where he met Laurel J. Carleton who had been an employee of the Mayflower Distributing Co. and who at that time was apparently an employee of the P. & S. Distributing Co. in which defendant Paster had a controlling interest. There was evidence that prior to this time there had been some correspondence between Carleton and Paster with reference to the proposed purchase of

certain slot machines located at or in the vicinity of Davenport, Iowa; that Carleton had sent Paster a list of slot machines which he reported could be "bought right if the parties who own them do not know who is purchasing them." During their meeting at Davenport Nilva and Carleton discussed the matter of purchasing the slot machines which Carleton had reported could be "bought right" and it was decided to negotiate for their purchase. There was evidence that Nilva telephoned Paster requesting that funds be placed in his personal account in the First National Bank in Minneapolis so that he could personally close the deal for the purchase of these slot machines; that he also telephoned the office of the Mayflower Distributing Co. and his wife for the purpose of making it certain that funds would be transferred to his account. He also telephoned defendant Gardner directing him to come to Davenport, Iowa, with a truck for the purpose of transporting these slot machines to St. Paul, Minnesota. Gardner secured a truck, drove it to Davenport, met with Nilva and Carleton and finally with their assistance picked up some thirty-eight slot machines, securing part of them from the American Legion and part of them from the 40 and 8 Club. There was evidence that Nilva reported the purchase to Paster by telephone advising him as to the number of machines picked up, the type, model and purchase price. Paster denied any knowledge that Nilva was purchasing slot machines until after the machines had been transported to St. Paul. Paster denied having had the long distance telephone conversation to which the witness Carleton testified. Further references to the evidence will be made in the course of this opinion.

At the close of the evidence produced by the government and again at the close of all the evidence the defendants moved for judgment of acquittal which motions were denied and the case was submitted to the jury on instructions to which apparently no exceptions were saved. The jury returned its verdicts finding defendants Nilva, Gardner and the Mayflower Distributing Co. guilty on the first count and finding defendants Nilva and Paster guilty on the second count.

Following the return of these verdicts the defendants moved in the alternative for judgment of acquittal notwithstanding the verdict or for a new trial. This motion was denied and in due time the defendants moved for a new trial on the ground of newly discovered evidence. This motion was denied.

From the judgment entered pursuant to these verdicts defendants prosecute this appeal and seek reversal on substantially the following grounds:

1. The Johnson Act for the violation of which defendants were convicted is unconstitutional.

2. The trial court erred in receiving secondary evidence concerning the so-called "lost letter."

3. The trial court erred in refusing to strike the testimony of government witnesses Laurel J. Carleton and Mary K. Carleton.

4. The trial court erred in refusing to grant the defense motions for acquittal at the close of the government's case and at the close of all the evidence on the ground that the evidence was insufficient to support and sustain the convictions.

5. The trial court erred in failing to give certain requested instructions to the jury.

6. The trial court erred in refusing to grant the motions for new trial.

Counsel for defendants earnestly contend that the Johnson Act, 15 U.S.C.A. §§ 1171–1177, under which the indictment here involved was drawn, is unconstitutional because it delegates legislative power of Congress to regulate interstate commerce. The pertinent part of the statute reads as follows:

"It shall be unlawful knowingly to transport any gambling device to any

place in a State, the District of Columbia, or a possession of the United States from any place outside of such State, the District of Columbia, or possession: *Provided,* That this section shall not apply to transportation of any gambling device to a place in any State which has enacted a law providing for the exemption of such State from the provisions of this section, or to a place in any subdivision of a State if the State in which such subdivision is located has enacted a law providing for the exemption of such subdivision from the provisions of this section."

It may be noted in passing that the provision with reference to the inapplicability of the statute to cases in which the transportation involves entering a place in any state which has enacted a law providing for the exemption of such state from the provisions of the above section is not applicable to the facts or the charge in this case. There is no contention that any of the places into or through which the transportation passed were within a state which had enacted the so-called exemption law. So far as the issues in this case are concerned the provision might well be eliminated, and the balance of the statute would certainly not be affected by such elimination.

■■ In support of their argument that the statute here involved is constitutionally invalid counsel assert that:

"It is mandatory upon Congress, if it chooses to act, to make a rule uniformly applicable to all states and in full force and effect in all states at all times."

We think this argument is fallacious.

Congress is vested with the exclusive power to enact laws affecting or regulating interstate commerce. In doing so, however, it is not required that its laws shall be uniformly applicable to all states. Thus, in Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 386, 83 L.Ed. 441, the court said:

"We have repeatedly said that the power given to Congress to regulate interstate and foreign commerce is 'com-plete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution.' Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L.Ed. 23. To hold that Congress in establishing its regulation is restricted to the making of uniform rules would be to impose a limitation which the Constitution does not prescribe. There is no requirement of uniformity in connection with the commerce power (Art. 1, sec. 8, cl. 3, Const.U.S. C.A.) such as there is with respect to the power to lay duties, imposts and excises (Art. 1, sec. 8, cl. 1, Const.U.S.C.A.). Clark Distilling Co. v. Western Maryland R. Co., 242 U.S. 311, 327, 37 S.Ct. 180, 185, 61 L.Ed. 326. * * * *"

■■ Notwithstanding the power of Congress to regulate interstate commerce, it may recognize the right of a state to exercise police powers that may incidentally affect that commerce. 11 Am.Jur. 85; State v. Appley, 207 S.C. 284, 35 S.E.2d 835, 162 A.L.R. 1184; Clark v. Holden, 191 Miss. 7, 2 So.2d 570; Dunn v. Nevada Tax Commission, 67 Nev. 173, 216 P.2d 985. Under the provisions of the Johnson Act it will not be effective in a state where the legislature has enacted a law exempting it from its provisions. This was not, we think, a prohibited delegation of legislative power. Currin v. Wallace, supra; United States v. Rock Royal Co-op., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294; United States v. Chemical Foundation, 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131; Opp Cotton Mills v. Administrator, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624.

In United States v. Rock Royal Co-op., supra [307 U.S. 533, 59 S.Ct. 1015], the court considered whether a referendum requirement was an invalid delegation of legislative power. In the course of the opinion in that case the court said:

"Under Section 8c(9)(B) of the Act it is provided that any order shall become effective notwithstanding the failure of 50 percent of the handlers to approve

a similar agreement, if the Secretary of Agriculture with the approval of the President determines, among other things, that the issuance of the order is approved by two-thirds of the producers interested or by interested producers of two-thirds of the volume produced for the market of the specified production area. By subsection 19 it is provided that for the purpose of ascertaining whether the issuance of such order is approved 'the Secretary may conduct a referendum among producers.' The objection is made that this is an unlawful delegation to producers of the legislative power to put an order into effect in a market. In considering this question, we must assume that the Congress had the power to put this Order into effect without the approval of anyone. Whether producer approval by election is necessary or not, a question we reserve, a requirement of such approval would not be an invalid delegation."

■ We think it has been established by controlling authority that Congress may legislate contingently upon the existence or non-existence of certain facts which will bring into force the declared policy of Congress.

It seems to us doubtful that the defendants are in position to raise this constitutional question because the challenged provision in no way affects them, but conceding that they may do so, we conclude that the Act is constitutional.

■ Laurel J. Carleton, called as a witness on behalf of the government, in the course of his testimony said that he had received through the mail a typewritten letter signed by defendant Paster, posted at St. Paul, Minnesota, and received by him at Davenport, Iowa. Complaint is now made that the court erred in permitting secondary evidence as to the contents of the letter. Rule 11 of this court describing the form and contents of briefs and records provides among other things as follows:

"If a point relates to the admission or exclusion of evidence, the statement shall quote the evidence referred to, and any objections or other equivalent action taken relative thereto, together with the rulings of the court thereon, giving the pages of the printed record on which the quotations appear."

Neither in the points to be argued nor in the statement of facts as printed in the brief is there set out either questions propounded to the witness, the objections to such questions, nor the ruling of the court thereon. Nowhere in this brief will there be found a reproduction of the ruling now complained of so that it can intelligently be considered. This point to be argued at most invites this court to search the record for the alleged error complained of. In these circumstances we do not feel called upon to recite in detail what evidence was produced with reference to the loss of this letter nor what diligence had been used in an attempt to find and produce it. Suffice it to say that there was evidence that the witness Carleton and his wife, each of whom had seen and read the letter and remembered the substance of its contents, testified to the receipt of this letter, its loss or destruction and the search to find it. Carleton testified that the letter was signed by defendant Paster. There was no error in receiving secondary evidence as to its contents. Hartzell v. U. S., 8 Cir., 72 F.2d 569; McDonald v. U. S., 8 Cir., 89 F.2d 128; Klein v. U. S., 8 Cir., 176 F.2d 184.

■ It is next contended that the court erred in refusing to strike the testimony of the witness Laurel J. Carleton and his wife Mary K. Carleton as to the contents of the "lost letter." As basis for this contention it is argued that proper foundation had not been laid for the receipt of their testimony relative to the contents of the "lost letter." We have already held that that contention is without merit. It is further urged that the testimony should have been stricken because Carleton was an accomplice and co-conspirator and that the testimony was without corroboration. In absence of a statute to the contrary a defendant may be convicted on the uncorroborated testimony of an accomplice if the jury is

convinced thereby of the defendant's guilt beyond a reasonable doubt. Glasser v. U. S., 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Kempe v. U. S., 8 Cir., 151 F.2d 680; Brickey v. U. S., 8 Cir., 123 F.2d 341; Wishart v. U. S., 8 Cir., 29 F.2d 103; U. S. v. Moran, 2 Cir., 151 F. 2d 661, 167 A.L.R. 403; U. S. v. Fawcett, 3 Cir., 115 F.2d 764, 132 A.L.R. 404. We think too that it cannot be said as a matter of law that the testimony of these witnesses with reference to the contents of the "lost letter" was not corroborated by other facts and circumstances shown by the evidence.

 Defendants interposed a motion for judgment of acquittal at the close of the government's testimony and renewed this motion at the close of all the testimony and they urge that the court erred in overruling their motion. In view of the fact that the jury found the defendants guilty in considering this question we must view the evidence in a light most favorable to the government. It was the province of the jury to consider the weight of the evidence and the credibility of the witnesses and we must assume that all conflicts in the evidence were resolved by the jury in favor of the government. It is urged that the testimony of the witness Laurel J. Carleton was vague and uncertain and not worthy of belief and that without his testimony there was no proof of a conspiracy and particularly no proof that would implicate the defendant Paster.

The evidence showed without dispute that these slot machines were transported in interstate commerce from Davenport, Iowa, to St. Paul, Minnesota. Two of the defendants personally participated in the physical acts involved in this transportation and there was evidence which we must assume the jury believed, implicating defendants Paster and the Mayflower Distributing Co.

 As to the count charging conspiracy it may be said that a criminal conspiracy is rarely susceptible of direct and positive proof. It may be established by circumstantial evidence. As

said by us in Blumenthal v. United States, 8 Cir., 88 F.2d 522, 531:

"The existence of a conspiracy must generally be established by circumstantial evidence, and in support of the charge of conspiracy, the overt acts and the circumstances under which they are committed may be considered in connection with other evidence. Safarik v. United States, 8 Cir., 62 F.2d 892; Goode v. United States, 8 Cir., 58 F.2d 105; Feigenbutz v. United States, 8 Cir., 65 F.2d 122; Galatas v. United States, 8 Cir., 80 F.2d 15.

"While there must be an agreement among the defendants charged, it need be in no particular form; it need not be expressed, but may be an implied understanding, and it is usually to be inferred from the circumstances shown in each case."

It is to be noted in passing that the jury acquitted defendant Gardner on the conspiracy charge and we think the evidence amply sustains that charge as against defendants Paster and Nilva.

 The court refused an instruction requested by defendants which had special reference to testimony of the witness Carleton relative to the contents of the "lost letter." We cannot find in this record that the defendants excepted to the alleged refusal of the court to give this requested instruction. The court in its general instruction with reference to the duty of the jury to consider the credibility of the witnesses said:

"In this connection, Ladies and Gentlemen of the jury, you are the sole and exclusive judges of the credibility of all of the witnesses, and it is for you to say who should be believed, and to what extent. In determining those questions, you may, among other tests, observe the demeanor of the witnesses upon the stand, their candor or lack of candor, their manner of testifying, whether direct or evasive, whether straightforward or shifty, their age and experience, and the reasonableness or unreasonableness of their story when viewed in the light of the facts in the case which are ad-

mitted or proven by uncontroverted testimony, and when also viewed in the light of your own judgment as men and women of experience and affairs.

"You may also consider any testimony as to inconsistent statements or admissions made by any of the witnesses upon the stand or upon other occasions. You may also take into consideration the power and ability of the several witnesses to observe what happened at the time and place in question, and to remember what happened and to relate correctly what happened and what they remembered. You may also consider any interest that a witness has or appears to have in the outcome of the action.

"If you should find that any witness here upon this trial has knowingly and wilfully testified falsely as to any material facts in the case, you are at liberty to totally disregard the testimony of that witness except so far as it may be corroborated by other credible evidence in the case."

This instruction fairly explained to the jury their duty relative to weighing the evidence and passing upon the credibility of the witnesses. Counsel for defendants, however, asked that further cautionary instructions be given relative to the testimony of the witnesses as to the contents of the "lost letter" and the court apparently in response to this request further instructed the jury as follows:

"The existence of this letter is denied by the defendant Paster. In determining whether or not such a letter ever existed, or if one did exist, as to whether or not its contents contain the statements asserted, you are instructed that your determination should be guided by certain recognized rules. It is recognized that while the contents of an instrument might be proved by the recollection of a witness who has recently read it, the difficulty of retaining in the memory the contents of a written instrument after a considerable length of time should be kept in mind. In considering testimony as to missing documents, the elements of possible bias or interest should be considered. You should deter-

mine from the demeanor, manner and general bearing of witnesses whether or not their testimony is biased. The bias of a witness has a well known influence in quickening or retarding the memory, and allowance should be made in weighing the testimony of such a witness."

No objections nor exceptions were saved to the giving of any of the court's instructions. The contention that the jury should have been given still further cautionary instructions relative to the witness Carleton is wholly without merit.

■ It is finally urged that the court erred in denying defendants' motion for new trial on the ground of newly discovered evidence. A perusal of this record makes it extremely difficult to determine what this alleged newly discovered evidence was. The motion was addressed to the sound judicial discretion of the trial court and the issue there presented cannot be tried de novo in this court. The witness Laurel J. Carleton had testified to the receipt of a letter signed by the defendant Paster, mailed in St. Paul, Minnesota and received by Carleton in Davenport, Iowa. He testified that he had read the letter and remembered the substance of its contents. His wife, produced as a witness by the government, likewise testified that she had read the letter and that she remembered the substance of its contents. As we have observed earlier in this opinion, on proper foundation being laid the court permitted these witnesses to testify as to the contents of the "lost letter." The letter in effect requested Carleton to give attention to the location or lining up of slot machines for purchase. The importance of the letter was that it was direct evidence that defendant Paster had knowledge that the slot machines later purchased and transported were being so purchased. There was, however, other evidence of Paster's knowledge of and connection with the purchase and transportation of these slot machines. By way of illustration there was evidence which the jury doubtless credited that while Carleton was employed by the Paster enterprises, but

before January 16, 1951, Paster stated to Carleton in substance that he would be in the market for used slot machines after laws were passed so the operators would be willing to give them away; that about the middle of January, 1951, Paster in a long distance telephone conversation with Carleton stated that he (Paster) was interested in buying any used slot machines that could be purchased at a very low price and at this time he directed Carleton to try to locate such equipment; that on or about January 16, 1951, Paster gave Carleton a direct order to do something about lining up slot machines for subsequent purchase; that on January 18, 1951, Paster asked Carleton to furnish him with an inventory of slot machines which were available for trade or sale; that around the middle of February, 1951, Carleton informed Paster by telephone that Sandler objected to him spending his time as an employee of P. & S. Company trying to line up slot machines for the Mayflower Distributing Co. and Paster in effect ordered him to continue lining up the slot machines, saying, "Well, you know who hired you in the beginning, and I will be in business when Sandler isn't," and at this time Paster again directed Carleton to tell him the names of the slot machine owners who were desirous of disposing of slot machines; that on or about March 1, 1951, in a long distance telephone conversation with Sammy Nilva, Paster confirmed the arrangements to send a truck from St. Paul to the Tri-City area, to pick up the slot machines and to return via Illinois and Wisconsin; that on or about March 1, 1951, in a long distance telephone conversation with Sammy Nilva, Paster assured Nilva that the money to purchase the slot machines would be placed in Nilva's personal bank account; that on or about March 2, 1951, at about 11:10 A. M., in a long distance telephone conversation with Sammy Nilva and Carleton, Paster received a complete report on the thirty-eight slot machines which had been purchased and the route Nilva intended to take in transporting the slot machines from the Tri-City area to St. Paul, Minnesota, and Paster then and there gave his approval to the transactions and the return route; and that on or about March 5, 1951, at St. Paul, Minnesota, Paster accepted the slot machines, knowing they had been transported in interstate commerce in violation of law. These slot machines were purchased with money from Paster's Mayflower Co. and some of them were subsequently sold by and for that company. The "lost letter" was therefore simply corroborative of the other testimony which in itself amply sustained the verdicts of the jury.

■■ As we interpret the contention of counsel for defendants in this case it is that the witness Laurel J. Carleton recanted his testimony relative to having received the letter from Paster. The record before the trial court includes a transcript of a conference, if it can be so called, between this witness and the trial judge. The witness voluntarily appeared before the trial judge and the record shows in part the following:

"The Court: Well, as I understand it, the only thing that you are concerned with now is whether or not this letter, which you haven't changed your mind about at all as to its existence and contents,—there isn't any doubt about that?

"Mr. Carleton: No.

"The Court: Your story is the same now as you swore to it on the witness stand, that Herman Paster wrote you a letter and you described the contents of the letter as best you could when you were testifying. That is the situation there, isn't it?

"Mr. Carleton: That is right.

"The Court: All right. Now you have been bothered as to whether or not that letter was dated in the year 1950 or 1951. You are of the opinion that in your testimony you described it as a letter written in 1951. That is correct, isn't it?

"Mr. Carleton: Yes, at the trial.

"The Court: And you have been thinking over it a great deal and you think

that if it had been written in 1951 you should have it.

"Mr. Carleton: That is right, I should.

"The Court: It wouldn't be destroyed. But you can't find it and you think it was lost in a fire, and if it was lost in a fire, then it would have been written in 1950. Is that the story?

"Mr. Carleton: That's right, Your Honor, * * *."

The witness was produced at the hearing of the motion for new trial on the ground of newly discovered evidence. The court interrogated him as follows:

"The Court: Perhaps we can obviate all this by you answering that simple question Mr. Graff put to you. If we could stay the hand of time and get back to that jury that read that verdict, and you were still on the witness chair there, what would you say to them now as to whether you ever received such letter from Mr. Paster? Would you say you did or did not?

"The Witness: I would say that to the best of my recollection, because I have nothing to substantiate that I got the letter, that I haven't got the letter and I would not say I had the letter unless I had proof of it."

Other testimony given by this witness on the motion for new trial was equally evasive and uncertain. There was proof that the fire in which he thought he might have burned the letter occurred not in 1950, but in 1951. Mrs. Carleton did not attempt in any manner to recant her testimony and it was for the trial court who had heard the witness testify at the trial and heard him make his statement to the judge in chambers and heard him testify on the motion, to determine what truth was to be gathered from his testimony and whether he testified truthfully at the time of the trial. Generally a motion for new trial on the ground of newly discovered evidence is looked upon with distrust and disfavor. It should not be granted unless the alleged newly discovered evidence is of such probative force and character that its introduction would probably result in a verdict for the party seeking the new trial. The trial court determined the facts in favor of the government on this motion. What is said by the Supreme Court in U. S. v. Johnson, 327 U.S. 106, 66 S.Ct. 464, 466, 90 L.Ed. 562, is here apposite. The court there said, inter alia:

"The trial judge's findings were supported by evidence. He had conducted the original trial and had watched the case against Johnson and the other respondents unfold from day to day. Consequently the trial judge was exceptionally qualified to pass on the affidavits. The record of both the original trial and the proceedings on the motions for a new trial shows clearly that the trial judge gave the numerous elements of the controversy careful and honest consideration. We think that even a casual perusal of this record should have revealed to the Circuit Court of Appeals that here nothing more was involved than an effort to upset a trial court's findings of fact. * * * The Circuit Court of Appeals was right in the first instance, when it declared that it did not sit to try de novo motions for a new trial. It was wrong in the second instance when it did review the facts de novo and order the judgment set aside."

In Harrison v. United States, 5 Cir., 191 F.2d 874, 876, the witness there recanted and repudiated the testimony given by him at the trial. In the course of the opinion the court said:

"The trial judge, from his knowledge of the original trial, from having heard the witnesses testify and observed their demeanor on the stand, was better qualified than is this court to pass on the affidavits. We do not find that the trial judge abused his discretion in overruling the motion for new trial. The judgment is therefore affirmed."

On this phase of the case we conclude that there was no abuse of discretion in overruling the motion for new trial on the ground of newly discovered evidence.

A review of the entire record convinces us that defendants were represented by able counsel and that they were accorded a fair trial by the trial court. The judgments appealed from are therefore affirmed.