Elmo T. CHRISTIANSON and Herman
Paster, Appellants,

v.

UNITED STATES of America,
Appellee.

Nos. 15299, 15300.

United States Court of Appeals
Eighth Circuit.

Nov. 1, 1955.

Rehearing Denied Dec. 5, 1955.

Philip R. Bangs, Grand Forks, N. D., and Alvin C. Strutz, Bismark, N. D., for appellant Elmo T. Christianson.

William P. Murphy, St. Paul, Minn. (John W. Graff, St. Paul, Minn., was with him on the brief), for appellant Herman Paster.

Oliver Dibble, Sp. Asst. to the Atty. Gen. (Warren Olney III, Asst. Atty. Gen., and William R. Mills, Asst. U. S. Atty., Bismarck, N. D., were with him on the brief), for appellee.

Before SANBORN, COLLET, and VAN OOSTERHOUT, Circuit Judges.

COLLET, Circuit Judge.

Defendants Elmo T. Christianson, Herman Paster, and Allan Nilva were indicted October 7, 1952, for conspiracy to violate the Johnson Act, 15 U.S.C.A. § 1172, which prohibits the interstate transportation of gambling devices. Defendant Christianson was elected Attorney General of the State of North Dakota, November 7, 1950. He took office January 2, 1951. Defendant Paster had for several years been extensively engaged in the sale, distribution and operation of coin-operated machines of various types, including gambling devices. See Nilva v. United States, 8 Cir., 212 F.2d 115. He operated through several personally-owned and controlled Minnesota corporations located at St. Paul, Minnesota, where he resided and

maintained his place of business. Defendant Nilva was attorney for Paster and an executive of one of these corporations. Named in the indictment as co-conspirators, but not made defendants, were James Brastrup, Neil Van Berkom, and Cyrus Bechtel. The conspiracy charged was a continuing one. The gravamen of the charge was that in November, 1950, the conspirators conspired and agreed to transport gambling devices into North Dakota where they would be later operated under the protection of the Attorney General-elect Christianson, after he assumed that office. The Johnson Act did not go into effect until January 2, 1951, hence the charged conspiracy was not unlawful under that Act at the time it was charged to have been initially conceived. Upon the first trial of this case in March, 1953, Defendant Nilva was acquitted. The jury failed to agree concerning the guilt of Christianson and Paster. A mistrial was ordered as to the latter, and they were again tried in March, 1954, when they were both convicted. From that conviction both appeal. Motions for a directed verdict were made at the close of the Government's case and again at the close of all the evidence.

The most important question is whether the evidence is sufficient to sustain the convictions. Christianson emphasizes the point that even if the evidence was sufficient to establish the agreement charged, and even if it later ripened into an unlawful conspiracy by reason of adherence to the original agreement and its performance and execution by overt acts subsequent to the effective date of the Johnson Act, there is no evidence to support the jury's finding that he was a party to any conspiracy to violate the Johnson Act after it became effective. Without conceding the existence of the original agreement charged to have been entered into in 1950, he insists that if the evidence was sufficient to sustain the jury's finding that such an agreement was entered into in 1950, the evidence conclusively shows a legal renunciation of or withdrawal from such agreement prior to the time anything was done to carry it out after the Johnson Act became effective.

Much of the evidence pointing to the defendants' guilt came from the testimony of the witness James Brastrup, who testified for the prosecution. Although Brastrup's credibility was vigorously attacked, it is reasonable to conclude from an examination of the rather extensive record that if the jury had not accepted as true at least the important features of Brastrup's testimony, there would have been no conviction. And since the jury must weigh the credibility of the testimony, we are relegated on appeal to an appraisal of its sufficiency and not its convincing force. As it has been so frequently stated, we must on appeal view all of the evidence in its most favorable aspect to the jury's verdict. It is in that light that the following facts are stated. Many facts appearing in the record which would be conducive to a conclusion opposed to the jury's verdict need not, for the reason stated, be recited. And for the benefit of defendants' counsel, we should observe that in their zeal to advance the cause of their clients' interests, they have in their briefs minimized the Government's evidence to the point of the exclusion of many salient facts, possibly overlooking our rules which require an objective presentation of the material facts.

There was substantial evidence that Christianson, then a candidate for Attorney-General of North Dakota, went to Brastrup in July, 1950, asking for assistance in raising money for campaign expenses. Brastrup gave him $50.00 at that time. About ten days later, Brastrup and Christianson again discussed campaign funds, at which time Brastrup agreed to solicit such funds in return for favors from the Attorney General's office in the event of Christianson's election. In October, 1950, Christianson told Brastrup he absolutely had to have money. Brastrup told him that he, Brastrup, understood there was some "out-of-state" money available. Christianson said he did not care where it came from

as he had to have it. Brastrup told Christianson about a slot machine distributor and operator who might furnish funds. Brastrup had heard of Paster but did not know him or know how to communicate with him. Brastrup made inquiry about Paster, obtained a letter of introduction to Paster and made an appointment by telephone to meet Paster in St. Paul. Brastrup met Paster in St. Paul, October 20, 1950, told Paster that he, Brastrup, was representing Christianson, who was sure to be elected Attorney General of North Dakota, and that Brastrup wanted money for Christianson's campaign. Paster told him that he, Paster, would not put up the money at that time, but that if Brastrup would put up the money and Christianson was elected, Paster would see that the money was paid back, that all Christianson would have to do as Attorney General would be to make some rulings and give some opinions "that would overlook the operation of machines in North Dakota." Later Brastrup called Paster by telephone from North Dakota and verified this understanding with Paster. In that conversation Brastrup expressed optimism about Christianson's campaign. Paster indicated satisfaction and told Brastrup to come to see him after the election.

Christianson was elected at the election held November 7, 1950. After the election Allan Nilva called Brastrup, congratulated him on Christianson's election, and in the same telephone conversation Paster told Brastrup he would like to meet Christianson. Brastrup so informed Christianson. Christianson and Brastrup went to St. Paul the following day by plane. Brastrup purchased the tickets, giving Christianson's name as "Nelson" at Christianson's direction. They went to Paster's office in St. Paul. Paster was busy and kept them waiting. Christianson expressed uneasiness about being there so long and asked Brastrup if they couldn't just get the money and get out "right away". However, they soon saw Paster, who told Christianson that

he had a bright political future if he would "do things right, take good advice and stay out of trouble." While they were talking, Paster had a long distance telephone call, during which Paster said to the other party that "he's right here now," and looking to Christianson and Brastrup asked if they could go to Chicago. The latter agreed. Paster obtained the plane tickets, purchasing Christianson's in the name of "Larson". Arriving in Chicago, Brastrup, Christianson and Paster went to hotel rooms maintained by the Bally Manufacturing Company and there met a Mr. Maloney, the owner of that company, which manufactured coin machines. They spent the evening there. During the evening Paster and Maloney called Christianson into a small room where they remained for some time. When they came out, Brastrup asked Christianson if they had fixed him up. Christianson replied, "Yes. You don't need to worry; everything is going fine. They're going to carry out their end of the agreement." Both stayed there that night. Both were given presents, a supply of which was kept in the rooms for customers. Paster offended Brastrup by asking Christianson in Brastrup's presence if Christianson knew Brastrup well and cautioning Christianson to be sure Brastrup did not get drunk and tell everything he knew. The next day they returned to St. Paul. Arriving at Paster's office, Paster handed Christianson an envelope, saying "Here is the other thousand dollars and that makes it." Christianson replied, "That's right", and put the envelope in his pocket. Paster then told Christianson that if Christianson lived up to his part of the bargain he would live up to his and that although Christianson would be offered a lot of money while he was in office, it did not matter what he was offered, he, Paster, would always do better and would keep him out of trouble. On the plane going back to Grand Forks, North Dakota, from St. Paul, Brastrup asked Christianson if he needed all of the

$2,000.00 and Christianson said he did, that he was buying a house.

Early in November, 1950, prior to the election on November 7, 1950, Brastrup met Christianson and Cy Bechtel (one of the named coconspirators) in Minot, North Dakota. Christianson told Bechtel that he, Bechtel, would be transferred from the Laboratories Department to a liquor inspector's position and that Bechtel's job would be to collect money from private clubs for the operation of slot machines and punch boards. After Christianson became Attorney General, he appointed Bechtel an inspector in his office and told Bechtel to "go ahead and contact the clubs the way Brastrup wanted [him] to." In April, 1951, Bechtel told Christianson that Brastrup was collecting too much money and that they couldn't get away with it. When Bechtel got home from that trip he read in the newspaper that he had resigned from the Attorney General's office, although he had not resigned. He was rehired in May and fired in June.

In the latter part of November, 1950, Brastrup was called by Paster to a meeting of "machine operators" at St. Paul. Paster was undertaking to sell machines and get them into North Dakota before the Johnson Act became effective. A number of such operators from North Dakota were there. Paster told them that Brastrup was Christianson's representative in North Dakota and the man to whom they were to pay the money for operating the machines. Paster said that a "great windfall" had happened to the North Dakota operators and there was "going to be a lot of cake out there" —that the arrangement had been made in that room only a few days before. At that meeting some concern was privately expressed by one of the North Dakota operators to Brastrup over the "Syndicate", referring to Paster, moving into North Dakota. The question was raised as to whether it would not be better to permit a Lou Stearns to handle such things instead of having an outside syndicate move in. Brastrup called Stearns by telephone. Stearns insisted that he was going to represent Christianson in western North Dakota and that no syndicate was going to move in. Paster said at the meeting that rumors had been circulated that Stearns, not Brastrup, was to be Christianson's agent, but that he, Paster, "had it from the man's own mouth" that Brastrup was to be the man and that Brastrup was the man the North Dakota operators were to pay. Later, in December, 1950, Brastrup told Christianson about the rumors that had been going around concerning Lou Stearns and that Paster had called him, saying that he, Paster, had been getting a number of calls from people saying that Christianson had changed his mind and was going to deal through someone else. Christianson said he would go with Brastrup to St. Paul and straighten Paster out "once and for all". They went to St. Paul, saw Paster, and Christianson reaffirmed the arrangement theretofore made. On that occasion Paster bought Christianson a new suit to wear at his inauguration.

Late in December, 1950, Paster called Brastrup saying that a law was going into effect soon which would prohibit moving the machines from Minnesota to North Dakota and suggested that storage space be obtained for the machines in North Dakota or near the state line so they could be easily moved in. No such arrangement was actually made. Brastrup went to St. Paul, December 26, 1950, and complained to Paster that he was getting many calls from North Dakota operators inquiring how the machines were to be handled and through whom they were to be purchased, that he could not answer those questions and that the procedure agreed upon was not good. Paster took a gun from his desk drawer and informed Brastrup that if he talked too much, double-crossed him, or lost his nerve that he could "easily be taken care of". At the same meeting it was agreed that Christianson, Paster and Brastrup would operate the machines at the clubs and share the proceeds.

Forty-three slot machines were sold to Emil Christianson, Williston, North Dakota, January 25, 1951. Transportation charges were paid by the Mayflower Distributing Company. It is difficult to determine from the record the exact date of the shipment, but three of these machines were not received by the Mayflower Company at St. Paul until January 18, 1951, hence at least those three were shipped subsequent to January 2, 1951. Stanley Baeder of New Rockford, North Dakota, purchased four slot machines from the Mayflower Distributing Company in December, 1950, and went to St. Paul, Minnesota, after them himself on January 22, 1951, taking them from St. Paul to New Rockford, North Dakota. The Mayflower Distributing Company bought and ordered shipped to Neil Van Berkom, Minot, North Dakota, eleven slot machines, under bill of lading dated December 30, 1950. These machines left the carrier's terminal at Minneapolis, Minnesota, at 6:30 p. m., January 2, 1951, and were delivered at Minot, January 4, 1951. There was evidence indicating a shipment made to a Mr. Sande in North Dakota late in December, 1950, or in January, 1951, the record of which had been withdrawn from the Mayflower Distributing Company's records upon direction of Allan Nilva. The invoices covering the four slot machines sold to Stanley Baeder were not put on his account. Defendant Paster testified that Van Berkom still owed over $12,000 because machines sold him had not been paid for and the law prevented their return to Minnesota.

Christianson had, prior to January 2, 1951, promised to appoint as an inspector someone to be recommended by a man named Binek, of Dickinson, North Dakota who was dissatisfied with previous inspectors. On Christianson's inauguration day, January 3, 1951, a man named Wolf reported to Brastrup at Bismarck to take the job. He was the man Binek had recommended. Christianson protested appointing Wolf because there was much objection to Wolf and he was being pressed to appoint another man. Final-ly, Christianson had Wolf brought into his office, had him sign a form of an oath of office, told him he was on the pay roll but to keep it quiet while the Legislature was in session. It appears that Wolf was never put on the pay roll.

In the latter part of February, 1951, Brastrup, Cy Bechtel and Christianson met in Grand Forks, North Dakota. Bechtel told Christianson that a number of small clubs were objecting to the amount of money demanded of them and asked Christianson if it would be all right to collect only 10 per cent. Christianson agreed. Bechtel said that he had heard rumors that Christianson and Brastrup were "all through" and asked Christianson whom he should turn the money over to. Brastrup said it was agreeable with him for Bechtel to pay it direct to Christianson, but Christianson said for Bechtel to turn the money over to Brastrup and that the latter would deal with him.

There was evidence of bank deposits of currency by Christianson as follows: October 25, 1950, $180.00; November 27, 1950, $100.00; December 4, 1950, $480.-00; December 12, 1950, $680.00; December 22, 1950, $700.00; March 2, 1951, $250.00; April 4, 1951, $350.00. Brastrup collected approximately $2900.-00 from slot machine operators between December 29, 1950, and March 12, 1951, inclusive, which he testified he turned over to Christianson after deducting certain expenses. Christianson and Brastrup had a settlement April 21, 1951, evidenced by a written release being given Christianson by Brastrup reciting that in consideration of the payment of $1560.00 to Brastrup the latter released Christianson of any and all claims "from the beginning of the world to the date hereof."

The record contains abundant evidentiary support for the jury's finding that a conspiracy or agreement was entered into between Paster, Christianson and others, during the latter part of 1950 to move slot machines into the State of North Dakota where they were to be op-

erated after Christianson became Attorney General in January, 1951, if the evidence relating to that agreement or conspiracy was admissible over defendants' objection that since the Johnson Act was not then in effect and the conspiracy was not then an unlawful one under that Act, it should not have been received in support of the charge of an unlawful conspiracy to violate the Johnson Act. We will consider the question of the admissibility of this evidence later.

There was also adequate evidentiary support for the jury's finding that slot machines were transported into North Dakota subsequent to the effective date of the Johnson Act, pursuant to the agreement of the conspirators.

A more difficult question arises as to whether the evidence showed Christianson's participation in the conspiracy to transport the machines into North Dakota and to operate them there, or whether Christianson's participation was only in an agreement to permit them to operate after they got there—a conspiracy within a conspiracy, so to speak, not transgressing the prohibitions of the Johnson Act. And the further question raised by Christianson, that the evidence shows conclusively that he withdrew from any agreement which might have been made before the Johnson Act became effective, warrants consideration. But upon analysis these difficulties resolve themselves into a doubt as to the weight of the evidence in view of Christianson's emphatic denial of wrongdoing and the very considerable evidence he offered in support of his denial. The weight of the evidence was for the jury to determine. It was not compelled to believe Christianson's evidence. It obviously did not or he would not have been convicted. Finding, as we must, that there was adequate and sufficient evidentiary support for the jury's verdict, it must not be disturbed.

■ Defendants challenge the admissibility of evidence relating to matters occurring prior to January 2, 1951, the effective date of the Johnson Act, under the rule that admissions or acts of a conspirator after the conspiracy has terminated or prior to its formation are not competent evidence against a coconspirator. Brown v. United States, 150 U.S. 93, 14 S.Ct. 37, 37 L.Ed. 1010; Morrow v. United States, 8 Cir., 11 F.2d 256; Gerson v. United States, 8 Cir., 25 F.2d 49; Collenger v. United States, 7 Cir., 50 F.2d 345; Minner v. United States, 10 Cir., 57 F.2d 506; and Lane v. United States, 8 Cir., 34 F.2d 413 are cited in support of this rule. An examination of these and many other cases to the same effect will demonstrate that the rule is not applicable here. This evidence was preliminary in the sense that it could not in itself and by itself establish an unlawful conspiracy for the very obvious reason that the law making the conspiracy and its object unlawful had not yet gone into effect. The trial court so instructed the jury. There could have been no misunderstanding that unless the agreement proved to have been made in the latter part of 1950, was recognized and adhered to to an extent which amounted to its reaffirmance after the Johnson Act became effective and an overt act was committed subsequent to the effective date of the Act, there could be no conviction for an unlawful conspiracy to violate the Johnson Act. It was also made clear that the evidence of acts and admissions of alleged conspirators occurring prior to January 2, 1951, was, at the time it was offered, to be received as evidence of only that conspirator's intent. To make such evidence binding on other conspirators, it was necessary that the proof be forthcoming that the conspiracy was in effect reaffirmed after January 2, 1951.

■■ The situation presented is unusual. The Government's theory, which the evidence supported, was that prior to the effective date of the Johnson Act arrangements were made, agreements entered into, and a conspiracy formed to later violate the Johnson Act when it became effective. The evidence complained of therefore established a conspiracy not at the time unlawful, but which would become unlawful if adhered to, reaffirmed

and attempted to be carried out later. It was charged and proved that the initial conspiracy was formed in contemplation of and for the purpose of violating the law which later became effective. Proof of the establishment of a conspiracy for the purpose of violating a law not yet in effect may be made, subject to and conditioned upon the making of proof that the conspiracy was adhered to, recognized and in effect reaffirmed, and its execution at least attempted after its objective became unlawful. Then, but only then, may the evidence of acts and admissions of each of the initial conspirators constitute evidence of an *unlawful* conspiracy against the other conspirators. It is no transgression of the rule forbidding the use of evidence of acts or admissions of one conspirator occurring before the conspiracy was formed or after it terminated against another conspirator, to admit evidence establishing an existing conspiracy to violate a law soon to be but not then in effect. This evidence was properly admitted.

Defendant Paster contends that the records of the corporation, Mayflower Distributing Company, were improperly used as evidence against him in violation of his rights under the Fifth Amendment. His point is that he was the owner of the Mayflower Distributing Company, the records were really his personal records and by the court's action in issuing a subpoena to the Mayflower Company to produce the records and their subsequent use, Paster was required to produce evidence which was used against him.

The force and effect of Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, is recognized by Paster. But he contends that these records were in fact his personal property and that under United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542, he could assert his personal privilege as to the corporate records. The doctrine so clearly stated in Wilson v. United States to the effect that an officer of a corporation, charged with a criminal offense, may not assert his personal privilege under the Fifth Amendment against self-incrimination and fail to produce or complain of the use of corporate records, even in his personal possession, is well settled. Nor do we find anything in United States v. White, supra, which indicates an intention on the part of the Supreme Court to overturn Wilson v. United States. The White case involved the refusal on the part of an officer of a labor union to produce for Grand Jury inspection the records of the union. The officer's objection was based upon the ground that the records might tend to incriminate the union and himself personally. He claimed his objection was sustained by both the provision of the Fifth Amendment against self-incrimination, now involved, and also by the protection of the Fourth Amendment prohibiting unlawful searches and seizures. The court reiterated its former holdings that the privileges asserted against self-incrimination were purely personal. That part of the opinion in the White case which Paster relies on we quote:

> "Moreover, the papers and effects which the privilege protects must be the private property of the person claiming the privilege, *or at least in his possession in a purely personal capacity*. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746." (Italics supplied.)

In the White case the union was not incorporated. In the Boyd case to which the Supreme Court refers in the above quotation, there was no corporation involved and the papers ordered produced were the private papers of a defendant. The Boyd case does emphasize the close relationship between the Fourth and Fifth Amendments in protecting a private person against self-incrimination, but neither that case nor the White case militates against or modifies the established principle that corporate records are not the private property of an individual protected by the Fourth and Fifth Amendments. The facts in

the present case present no ground for an exception to that rule.

Throughout the trial and in this court up to the time of the filing of his reply brief, Paster was asserting that the records of the corporation could not be used against him because they were in fact his personal records. Paster says in his brief that "throughout the trial" he "held to the position that the records sought by the Government were only nominally the records of the corporation, that the records were in his personal possession and control, and that such possession entitled him to the protection of the Constitution." In his reply brief for the first time he seeks to take advantage in his own behalf of the corporation's immunity from unlawful search and seizure under the Fourth Amendment, relying upon Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S. Ct. 182, 64 L.Ed. 319. He assumes that the records were unlawfully seized under color of an allegedly illegal extraterritorial impounding order of the District Court of North Dakota. The record indicates that the corporation never objected to the production of the records or sought their return, albeit Paster did. When this case was tried the first time, in March, 1953, the records were voluntarily produced by the corporation. Some of them were used, apparently without protest, in another criminal case against Paster and other defendants in the case of Nilva v. United States, 212 F.2d 115, tried in the District of Minnesota, involving the transportation of slot machines from Iowa to Minnesota. A short time before the second trial of this case in March, 1954, the District Court of North Dakota issued a subpoena for the records. The subpoena was not obeyed, Paster appearing and claiming his personal privilege in the records. That claim was denied, whereupon Paster's counsel stated that the records would be produced. When, on the third day of the trial, they had not been produced, the court issued a forthwith subpoena and an impounding order which was executed in Minnesota by the Unit-ed States Marshal for the District of Minnesota, who delivered the records to the Marshal for North Dakota, who in turn produced them in court. Paster again objected to their use on the ground they were his personal records.

Paster places reliance upon the case of In re Dooley, 2 Cir., 48 F.2d 121. But the same court in Lagow v. United States, 2 Cir., 159 F.2d 245, 246, in passing upon the question of whether Lagow, the sole shareholder and officer of a corporation, could prevent the use of corporation records, illegally seized (and ordered returned to the corporation), against Lagow, said:

"When a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment; documents which he could have protected from seizure, if they had been his own, may be used against him, no matter how they were obtained from the corporation. Its wrongs are not his wrongs; its immunity is not his immunity." (Citing cases.)

■■ But we do not determine the question of Paster's rights under the Fourth Amendment. The foregoing explanation of the situation in this case has been incorporated to demonstrate the lack of appeal on the merits of Paster's contention. The question now raised in the reply brief does not appear to have ever been presented to the trial court. Certainly it was not presented in such a manner as to direct attention to the precise question now urged. Nor did it so appear in the points and authorities in Paster's original brief in this court. It is a cardinal rule of appellate practice that, absent some compelling or persuasive reason to avoid an obvious miscarriage of justice, questions not presented to the trial court and not properly presented on appeal will not be considered. For that reason we do not determine this question.

It is asserted that the indictment is invalid for want of plainness, conciseness and definiteness. It is not subject to such infirmities. And the claim that it contained extraneous matter prejudicial to the defendants is likewise without merit. That part of the indictment complained about was neither read to nor read by the jury.

■ It is also contended that the indictment was invalid because it alleged a conspiracy beginning prior to the effective date of the Johnson Act. As heretofore noted, the indictment charged a continuing conspiracy. It was not invalid because it charged that the conspiracy began before the Johnson Act became effective. United States v. Randall, 2 Cir., 140 F.2d 70.

■ Error is charged on account of the cross-examination of the Defendant Paster. The general rules of cross-examination are well defined. They need not be restated. These general rules must have some flexibility in order that they may be properly applied to the great number of varied situations which arise. To accomplish the necessary flexibility and at the same time preserve the basic and susbtantive objectives of these rules, a considerable area of discretion is assigned to the trial court in applying the rules to a specific situation. Such a situation must be viewed and reckoned with by the trial court in the light of all related incidents occurring during the trial and cannot be confined to an isolated question or series of questions. While the questions complained of, which the court required Paster to answer, did not in themselves tend to prove or disprove the specific charge, they were sufficiently germane to portions of Paster's direct examination and statements of his counsel as to prevent the trial court's rulings from being an abuse of discretion.

One of defendants' witnesses was asked on cross-examination why she terminated a former employment and was asked if embezzlement of $200.00 of her employer's funds was not the reason. She answered that there was some "money trouble" but that she would not say that it had been called embezzlement. Out of the hearing of the jury it was made known to the trial court that she had confessed to appropriating $250.00 of her employer's money to her own use and had pleaded guilty to a criminal charge of larceny and received a sentence of six months.

■ Evidence of the conviction of crime as affecting the credibility of a witness is limited to conviction of a felony, an infamous crime, or a crime involving moral turpitude. Pittman v. United States, 8 Cir., 42 F.2d 793. The crime of larceny or embezzlement involves moral turpitude. Tillinghast v. Edmead, 1 Cir., 31 F.2d 81; United States ex rel. McKenzie v. Savoretti, 5 Cir., 200 F.2d 546; In re Kirby, 10 S.D. 322, 73 N.W. 92, 39 L.R.A. 856; In re Henry, 15 Idaho 755, 99 P. 1054, 21 L.R. A.,N.S., 207. There was no error in permitting the cross-examination.

A summary, or "schedule" as it was called, was made by an F.B.I. agent of the number of slot machines purchased and sold by the Mayflower Distributing Company between November 6, 1950, and April 15, 1951. The agent was an accountant but does not appear to have been qualified as an expert on what kinds of machines should be classified as "slot machines". The records from which the summary was made were in court at the time the agent testified. He was permitted to testify from his summary what the records showed as to the number of slot machines purchased and sold.

■ Counsel recognize the general rule that data taken from voluminous records may be used by a witness when the records are available for use in cross-examination to show any inaccuracies in the witness's memoranda. The objection went to the lack of qualification on the part of the witness to differentiate between machines which were slot machines within the meaning of the Johnson Act and which were not—a question of law. The classification of

certain machines as slot machines by the witness was an expression of an opinion. But the records were readily available to defendants from which it could have been readily ascertained which machines the witness had treated as slot machines in making the calculation resulting in the total number he said the records showed had been purchased. No effort was made to do so, and we find no complaint that the witness's classification was incorrect. The court instructed the jury concerning what devices were gambling devices within the meaning of the Johnson Act. We find no possible prejudice to the defendants from the use of the memorandum under these circumstances.

We have been requested to examine newspaper articles for the purpose of determining whether there was likelihood of such an unfavorable emotional atmosphere existing at the time of the trial that defendants could not have had a fair trial. It is conceded that in view of the cautionary instructions given that the effect of these articles would probably not in itself be considered reversible error. It does not appear whether the jury actually saw the articles. In deference to defendants' wishes we have examined the articles. We find nothing in them which leads to a belief that they could have resulted in defendants being deprived of a fair trial. On the contrary, these articles appear unusually objective.

The court's charge is objected to on the ground that it implied that the conspiracy charged could have been entered into prior to January 2, 1951. The charge told the jury that if such an agreement was made prior to January 2, 1951, to constitute the offense charged, it was necessary that the object of the conspiracy was to violate the Johnson Act and that it continue until after January 2, 1951. There is no merit in the criticism for reasons heretofore stated.

The defendants were accorded a fair trial. There being no error, the judgment is affirmed.