386 F.2d 953
 James Lee GREEN, Appellant,
v.
UNITED STATES of America, Appellee.
Walter Lee GREEN, Appellant,
v.
UNITED STATES of America, Appellee.
Floyd KING, Appellant,
v.
UNITED STATES of America, Appellee.
Ira Donnell WATKINS, Appellant,
v.
UNITED STATES of America, Appellee.
 Nos. 9444-9447.
 United States Court of Appeals Tenth Circuit.
 Dec. 18, 1967.
 
 Jo-Ann Fisher Corrigan, Oklahoma City, Okl., for appellants.
 John E. Green, Asst. U.S. Atty. (B. Andrew Potter, U.S. Atty., was with him on the brief), for appellee.
 Before LEWIS, BREITENSTEIN and SETH, Circuit Judges.
 DAVID T. LEWIS, Circuit Judge.
 
 
 1
 Appellants were each convicted under 18 U.S.C. 371 of conspiracy to receive, retain and conceal 321 stolen United States Postal Money Orders kmowing the same to have been stolen in violation of 18 U.S.C. 641 and falsely made in violation of 18 U.S.C. 500. Appellants King and Watkins were also convicted of a substantive offense in violation of 18 U.S.C. 641. Each appeals, contending that his conviction is premised on the violation by acts and conduct of both local and federal police officers of numerous procedural and constitutional rights and the projection of the 'fruit of a poisonous tree' in evidence at trial. We find merit in certain aspects of appellants' claims.
 
 
 2
 During early afternoon on August 8, 1966, officers of the Oklahoma City police observed a late model automobile bearing out-of-state license plates being driven in downtown Oklahoma City and carrying four male occupants. When the driver of the car parked in the near vicinity the police officers subjectively determined that the activities of the occupants would be well worth watching from the standpoint of law enforcement. The city officers proceeded to do just that, and, noting that the subject car was twice moved short distances, was in the vicinity of financial business institutions, and that the conduct of the occupants was unusual, the officers became increasingly apprehensive that some from of unlawful activity was in the making. The surveillance[1] continued for over an hour during which appellants Watkins and James Green entered a photo shop and appellants King and Walter Green wandered in the vicinity of the car. When Watkins left the photo shop he was stopped and questioned as to his name, address, and place of employment and was then arrested for vagrancy. His person was searched and a money order found which was later admitted in evidence after proof that it was stolen. James Green was next arrested in the photo shop as a vagrant and his person was searched. Nothing pertinent to out consideration resulted from this search.
 
 
 3
 Leaving Watkins and James Green in custody, two city officers then walked down an alley where appellants King and Walter Green were waiting near the car. As the Officers approached King they observed that he had a straight-edge razor protruding from his pocket and arrested him for carrying a concealed weapon. A search of his person revealed eleven postal money orders later determined to be stolen and admitted in evidence at trial. Walter Green was arrested for vagrancy and searched with no incriminatory result. Contemporaneously with these arrests the officers made a preliminary search of the car and found additional money orders, a long knife, and a rubber stamp of the type commonly used to stamp postal money orders. The fruits of this search were admitted in evidence at trial.
 
 
 4
 After appellants were lodged in the Oklahoma City jail postal authorities were notified of the incident. A federal search warrant was obtained and a thorough search of the car turned up 299 additional stolen money orders. The following day, prior to federal arraignment, appellants were severally interviewed by postal investigators and incriminating statements and handwriting specimens were made and obtained from each of the appellants.
 
 
 5
 We agree with the contentions of appellants Watkins and James Green that their original arrests as vagrants were not a lawful exercise of police power, that the searches of their persons were not justified as incidents to lawful arrest, and that as a consequence the money order found upon the person of Watkins was improperly admitted in evidence. Although the hour-long surveillance of appellants certainly pointed the finger of suspicion at their individual and concerted activity still neither of these appellants committed an unlawful act observed by the officers that can support a lawful arrest. Under Oklahoma law a city police officer is a state officer, City of Lawton v. Harkins, 34 Okl. 545, 126 P. 727, 42 L.R.A.,N.S., 69, and may arrest without warrant when a public offense is committed in his presence or when a felony has been committed and reasonable cause exists to believe the person arrested has committed it. Title 22, Okl.Stat. 196. Neither of these statutory authorities is applicable to the arrests of Watkins or James Green. Nor can the existence of an Oklahoma City vagrancy ordinance (not here cited to us) be corrupted in use so as to constitute a tool of avoidance or shortcut to the basic requirements of due process in the administration of justice. And this fundamental rule exists regardless of the ultimate determination of the existent suggestion attacking the constitutionality of particular statutes making vagrancy a crime of status. See Fenster v. Leary, 20 N.Y.2d 309, 282 N.Y.S.2d 739, 229 N.E.2d 426 (N.Y.Ct.App. July 7, 1967). Vagrancy is a chronic condition rather than a moment of idleness or unemployment and under no acceptable concept was committed by these appellants in the presence of the arresting officers. Indeed, the officers here testified that the first arrests were triggered by suspicion that a 'con game' was in progress and thus it follows that the arrest of Watkins and James Green was but a tool of convenience to gain time for investigation and give purported validity to otherwise unlawful searches and seizures. Such use of vagrancy statutes, we think, has been properly criticized. See generally Note, Use of Vagrancy-type Laws for the Arrest and Detention of Suspicious Persons, 59 Yale L.J. 1351 (1950); Foote, Vagrancytype Law and its Administration, 104 U. of Pa.L.Rev. 603 (1956).
 
 
 6
 Although the approach to appellants King and Walter Green was motivated by the same suspicion that occasioned the arrest of the other two appellants, the actual arrest of King differed. King was observed to be in possession subject to arrest without warrant under subject to arrest without earrant under Oklahoma law. Both the search of his person and of the car were reasonable under all the circumstances as incidental to a lawful arrest. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653; Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. We find no special pertinence in the subsequent arrest of Walter Green for vagrancy nor the search of his person although it would be naive and perhaps dangerous, after discovery of the weapon upon King, for the officers not to have searched his companion.
 
 
 7
 We conclude that the acts of the state officers in effectuating the subject arrests and searches were in part lawful and in part unlawful. 'The legality of a search cannot be balanced against the good faith of the searcher or the extent or correctness of his legal knowledge. An unlawful search, though made in the honest belief of right, remains unlawful and its fruits remain forbidden. A lawful search, though not made under subjective claim or knowledge of right, remains lawful and evidence so obtained is admissible.' Sirimarco v. United States, 10 Cir., 315 F.2d 699, 702. But it does not follow, as appellants contend, that the evidence obtained through the subsequent federal search was inadmissible or that the entire prosecution was premised and resulted as the 'fruit of the poisonous tree.'
 
 
 8
 It is, of course, the duty of all law enforcement officers to 'investigate, detect and secure evidence of crime,' Hollingsworth v. United States, 10 Cir., 321 F.2d 342, 352, and national law enforcement is dependent upon the exchange of information between state and federal officers. The enforcement of state law need not be thwarted by the action of federal officers and certain it is that the enforcement of federal law cannot be frustrated by the deliberate, illadvised or inadvertent acts of state officers. The true evidentiary rule is clearly set forth in Wong Sun v. United States, 371 U.S. 471, at 487-488, 83 S.Ct. 407, at 417, 9 L.Ed.2d 441, thus:
 
 
 9
 'We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959).'
 
 
 10
 Applying Wong Sun to the instant case we have no hesitancy in holding that the primary taint flowing from the unlawful arrest and searches of Watkins and James Green did not reach such exploitation as to invalidate prosecution on the conspiracy count in the indictment nor the prosecution of King upon the substantive offense charged.
 
 
 11
 Appellants next assert that oral statements and handwriting specimens given by appellants during interviews by the postal inspector do not meet the requirements of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and other applicable standards for admission in evidence. Particular emphasis is leveled against the failure of the inspector to warn appellants that their statements could be used in court 'against them' although admittedly they were informed that such statements could be used in court. This contention, as well as others made in similar vein, is not well taken for as this court said in Coyote v. United States, 380 F.2d 305, at 308:
 
 
 12
 'Surely Miranda is not a ritual of words to be recited by rote according to didactic niceties. What Miranda does require is meaningful advice to the unlettered and unlearned in language which he can comprehend and on which he can knowingly act. We will not indulge semantical debates between counsel over the particular words used to inform an individual of his rights. The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights.'
 
 
 13
 So, too, the admission of the handwriting examples admitted in evidence complies with the dictates of Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178.
 
 
 14
 Finally appellants contend that the trial court admitted in evidence the particularized statements given by appellants in response to the separate interrogations of each by the postal inspector without adequate instructive limitation as to the purpose that the jury could consider such statements. We agree that this contention is meritorious.
 
 
 15
 At the time that the postal inspector interviewed the appellants individually each was in custody and under arrest. The conspiracy had thus terminated and any statement given by appellants was admissible only against the declarant and under appropriate instructions to the jury. Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278. A pretrial motion for severance had been denied, alerting the court to the ever-present possibility of procedural prejudice in the joint trial. No instruction to the jury as to the limited consideration that could be properly given by it to this vital testimony[2] was given at the time of introduction. On final submission to the jury the following general instructions were given:
 
 
 16
 'In determining whether or not a defendant or defendants or any other person was a member of a conspiracy, the jury is not to consider what others may have said or done. That is to say, the membership of a defendant or any other person in a conspiracy must be established by the evidence in the case as to his own conduct, what he himself wilfully said or did.'
 
 And again:
 
 17
 'It is your duty to give separate, personal consideration to the case as against each individual defendant; that is, the four defendants here. When you do so, you should analyze what the evidence shows with respect to that individual, leaving out of your consideration entirely any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case determined from his own acts and statements, and the other evidence in the case which may be applicable to him.'
 
 
 18
 As pointed out in Delli Paoli, the jury in a conspiracy case has a heavy intellectual burden in sorting out, keeping in mind and applying the impact of testimony admissible for a limited purpose only. In the case at bar we are satisfied that the lack of a particularized and repetitive instruction upon the subject was error vitiating the conviction of all.
 
 
 19
 We conclude that the conviction of appellant Watkins for a substantive offense, being premised primarily upon evidence obtained from an illegal search of his person, cannot be sustained and that the convictions of all must be set aside for procedural error.
 
 
 20
 The judgments and each of them are reversed and the cases remanded with instructions to grant new trials.
 
 
 
 [1]
 The record reflects repeated references to an 'unlawful surveillance.' The surveillance, as such, was lawful and constituted commendable police work
 
 
 [2]
 For example, in the testimony of the postal inspector concerning the interview with Watkins the following appears:
 'I asked who the money orders belonged to, these orders that had been found in the Mustang, and he says, 'Well, they belong to all of us as a group."