**Charles F. LEEPER, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 536–70.**

United States Court of Appeals, Tenth Circuit.

June 30, 1971.

Rehearing Denied Aug. 17, 1971.

Mac Oyler and John Romig Smith, Oklahoma City, Okl., for appellant.

William R. Burkett, U. S. Atty., and John E. Green, Asst. U. S. Atty., Oklahoma City, Okl., for appellee.

Before LEWIS, Chief Judge, and ALDISERT * and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Charles F. Leeper appeals from the sentences imposed following his conviction by a jury of charges brought under 18 U.S.C. § 472 alleging possession and concealment of counterfeit notes of the United States with intent to defraud, and 18 U.S.C. § 371 alleging conspiracy

* Of the Third Circuit, sitting by designation.

with Shirley Burghart and Grady Roskam to violate 18 U.S.C. § 472.

Appellant charges error to the trial court in (a) overruling his motion to suppress, (b) overruling his motion for judgment of acquittal relating to the conspiracy charge, and (c) overruling objections made to certain cross-examination.

In reviewing evidence following jury verdict of guilty, we view it in the light most favorable to the prosecution. United States v. Mecham, 422 F.2d 838 (10th Cir. 1970); Lewis v. United States, 420 F.2d 1089 (10th Cir. 1970).

Leeper and Shirley Burghart arrived at the home rented by one Ruth Kidd in Carnegie, Oklahoma during the early morning of May 3, 1970. Kidd, recently divorced, lived there with her two small children. She had been receiving Aid to Dependent Children since January, 1970, as her sole source of income. One Fred K. Schupbach, her boyfriend, who was then serving at nearby Fort Sill, was in the home with Kidd when Leeper and Burghart arrived. Kidd had known Shirley Burghart previously. Leeper and Burghart displayed to Kidd and Schupbach a suitcase containing approximately $70,-000.00 in counterfeit $100 bills. Kidd was solicited by Burghart and Leeper to help pass the money. Schupbach obtained one of the counterfeit $100 notes. The next day he delivered the counterfeit note to Mickey Miller of the United States Secret Service. He informed Miller of that which occurred in the Kidd residence. Leeper, Burghart and one Grady Roskam took Kidd with them on a trip May 4, 1970 to Lawton and Cache, Oklahoma. Leeper placed several of the $100 counterfeit bills in a white envelope and left the group to sell the bills to a man in Lawton. At Cache, Kidd and Burghart entered a grocery store where Burghart passed a counterfeit $100 bill in the purchase of about $9 worth of groceries. She gave Leeper the change. Later, Leeper and Burghart informed Kidd that they had sold some of the counterfeit bills in Lawton. At about midnight the group arrived back at the Kidd residence in Carnegie. Schupbach was there upon their arrival. He informed Kidd that he had contacted the Secret Service. When Kidd and Schupbach left the residence to take the babysitter home, they telephoned Agent Miller. Kidd informed Miller that the three suspects were then at her home. She related to Miller that which had transpired that day at Lawton and Cache. She informed him that about $10,000.00 in counterfeit $100 bills were in her home at that time. She voluntarily granted consent to search her home for the counterfeit bills, without knowledge of the fact that Agent Miller had obtained a search warrant.

Miller and other officers arrived at the Kidd residence at about 3:30 o'clock a. m. on May 5, 1970. Miller served the search warrant on Ruth Kidd and the officers proceeded to search the residence for counterfeit bills. The warrant authorized night time search. Some $9,-700.00 of the counterfeit $100 bills had been placed in a box in the bathroom by Burghart and Kidd. Kidd directed the agents to the box in their search.

 Leeper was an invitee while in the Kidd residence. Kidd voluntarily granted consent to the search during her conversation with Agent Miller. Kidd had assisted Burghart in placing some $9,700.00 of the counterfeit $100 bills in a particular box which they in turn placed in the bathroom. Following the officers' entrance for search, Kidd directed them to the box. The bathroom was a communal area of the residence. Leeper was lawfully on the premises as an invitee, and as such he did qualify as a "person aggrieved" under Rule 41 (e) of the Federal Rules of Criminal Procedure to challenge the legality of the search and seizure. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Villano v. United States, 310 F.2d 680 (10th Cir. 1962). In these and many other cases where the rule in Jones, *supra*, was applied, it was determined that no effective consent to a search had been granted. It has

been held that one having occasional use of the premises, including a child, has no Fourth Amendment standing to object to a search with consent granted by the parent or owner or landlord. Rees v. Peyton, 341 F.2d 859 (4th Cir. 1965). To the same effect, it has been held that consent granted by a wife is binding upon her husband. Roberts v. United States, 332 F.2d 892 (8th Cir. 1964), cert. denied 380 U.S. 980, 85 S.Ct. 1344, 14 L.Ed.2d 274 (1965). There are diverse rulings on the issue of the effectiveness of a search based upon consent granted by one other than the accused. We hold that in this case the consent granted by Ruth Kidd, lessee of the searched premises, was effective as to Leeper. One who has possession and control of the articles seized or the premises on which they were found may consent to a search which produces evidence incriminating someone else. United States v. Sferas, 210 F.2d 69 (7th Cir. 1954), cert. denied Skally v. United States, 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086 (1954); United States v. Eldridge, 302 F.2d 463 (4th Cir. 1962). Kidd knew, or should have known, after speaking with Schupbach and before placing the call to Agent Miller granting consent to search, that she could be in legal jeopardy. Kidd had testified that when she phoned Agent Miller she told him that Burghart, Leeper and Roskam were then at her home and that approximately $10,000.00 in $100 counterfeit bills were in the home. She volunteered permission for search of the residence. On cross-examination she acknowledged that she placed the call to Miller and volunteered the search in order to avoid the risk of prosecution. Agent Miller testified that when he and other law enforcement officers entered the Kidd home they did so pursuant to the search warrant and the consent to search granted by Kidd. The record does not indicate that Agent Miller informed Kidd that he had no right to search the residence without a warrant. We do not deem such warnings necessary under the circumstances of this case. Some courts have held that no such warnings are required in any event. United States v. Goosbey, 419 F.2d 818 (6th Cir. 1970); United States ex rel. Combs v. LaVallee, 417 F.2d 523 (2d Cir. 1969), cert. denied 397 U.S. 1002, 90 S.Ct. 1150, 25 L.Ed.2d 413 (1970); Gorman v. United States, 380 F.2d 158 (1st Cir. 1967). Here, Kidd's consential search was granted voluntarily, freely and without duress or coercion. Wren v. United States, 352 F.2d 617 (10th Cir. 1965). Leeper argues, however, that Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), prohibits reliance by the prosecution upon the consent granted by Kidd for the search, in light of the fact that Agent Miller claimed authority to search under the warrant. However, in the *Bumper* case consent was granted after service of the search warrant. The court found that, under those circumstances, consent was coerced. In the case at bar, Kidd granted consent to search voluntarily and without prior knowledge of the fact that Miller had obtained a search warrant.

Leeper attacks the validity of the search warrant. In addition to the validity of the search predicated upon the consent granted by Kidd, we hold that the search was valid under the authority of the warrant.

Agent Miller contacted Fred Schupbach on May 4, 1970. At that time Schupbach handed Miller the counterfeit $100 bill which he had taken from Burghart's suitcase in the Kidd residence. Miller, an expert, examined this note and found it to be counterfeit. Thereafter, Miller took a sworn statement from Schupbach relating to remarks made in the Kidd residence on May 3, 1970 by Leeper and Burghart, concerning the counterfeit notes, including the wishes expressed by them that Kidd help them pass some of the notes the following day. Schupbach's affidavit further related that Leeper displayed a suitcase containing approximately $70,000.00 of counterfeit $100 bills. Leeper laid out a plan for Burghart and Kidd to go to Oklahoma City the following day, rent a car

and pass some of the counterfeit notes in Lawton and south into Texas. Miller presented the $100 counterfeit note and Schupbach's sworn statement to Commissioner Cocke on the afternoon of May 4, 1970. Miller had conducted an independent investigation of Schupbach's reliability with his Fort Sill superiors after receiving the bill and determining that it was counterfeit. Miller also traveled with Schupbach to Carnegie where he observed the Kidd residence. Miller spent approximately one and one-half hours with Commissioner Cocke before the search warrant was issued. When Commissioner Cocke was asked upon what grounds he issued the search warrant, he responded that he did so upon the sworn statements of Miller and Schupbach together with conversations had with Miller. Commissioner Cocke testified that he quizzed Agent Miller thoroughly both about the Schupbach statement and "the whole matter". These conversations were not recorded or reduced to writing. Miller's affidavit filed with the Commissioner for search warrant reads:

"Before J. Roy Cocke, 606 'D' Avenue, Lawton, Oklahoma:

The undersigned being duly sworn deposes and says:

That he is positive that on the premises known as, a one (1) story white block house, located at the Southwest corner of the intersection of South Elgin Street, and East Ash, in Carnegie, Oklahoma and all out buildings and appurtenances adjacent thereto in the Western District of Oklahoma, there is now being concealed certain property, namely, counterfeit currency, which is a violation of Title 18, U.S.C. Sec. 471;

AND THAT the facts tending to establish the foregoing grounds for issuance of a search warrant are as follows:

A signed sworn statement by one Fred K. Schupbach, in which he states he saw counterfeit currency at this location."

Leeper contends that there is no probable cause shown in the affidavit executed by Miller for a search warrant. He cites Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and other decisions for the proposition that the Miller affidavit fails to support the probable cause requirements of Rule 41(c), Federal Rules of Criminal Procedure. He contends that the affidavit was the only information relied upon or which could have been relied upon by Commissioner Cocke for issuance of the search warrant. There is some authority for his argument that the affidavit must show on its face enough to justify issuance of the warrant and that it may not be supplemented by oral testimony of the affiant before the judicial officer. United States v. Sterling, 369 F.2d 799 (3rd Cir. 1966); Gillespie v. United States, 368 F.2d 1 (8th Cir. 1966). Contra, however, is the holding that the warrant was properly issued, although the original affidavit was insufficient, when examination by the magistrate disclosed additional facts showing probable cause, which were written on the affidavit. Naples v. Maxwell, 393 F.2d 615 (6th Cir. 1968), cert. denied 393 U.S. 1080, 89 S.Ct. 850, 21 L.Ed.2d 772 (1969). Even in those instances where the only matters presented to the magistrate are those contained in the affidavits, appellate courts will not invalidate the warrant by interpreting the affidavit in a hypertechnical manner when the magistrate has found probable cause. United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Edmondson v. United States, 402 F.2d 809 (10th Cir. 1968). Whatever deficiencies may have existed in the establishment of probable cause in the Miller affidavit, i. e., conclusory statements and failure to relate underlying facts, were cured by Miller personally during his appearance before Commissioner Cocke. In Spinelli, supra, Aguilar, supra, Ventresca, supra, Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), and Giordenello v. United States,

357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), the sole evidence upon which the search warrants were issued constituted affidavits signed by the officers. The requirements of the Fourth Amendment are satisfied if probable cause is established when the magistrate makes his independent judgment. An insufficient affidavit may be "rehabilitated" by testimony disclosed to the issuing magistrate. Whiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); Giordenello, *supra*. Thus, in Aguilar v. Texas, *supra* 378 U.S. at 109, 84 S.Ct. at 1511 the Court noted:

> "The record does not reveal, nor is it claimed, that any other information" (other than the officer's affidavit) "was brought to the attention of the Justice of the Peace. It is elementary that in passing on the validity of the warrant, the reviewing court may consider *only* information brought to the magistrate's attention. Giordenello v. United States, 357 U.S. 480, 486, 79 C.J.S. Searches and Seizures p. 872."

It may be argued that Whiteley v. Warden, Wyoming State Penitentiary, *supra*, and Aguilar v. Texas, *supra*, concerned constitutional requirements for obtaining State search warrants, not federal search warrants. The distinction is without merit. In United States v. Sterling, *supra*, and Gillespie v. United States, *supra*, the courts anchored to that language in Rule 41(c), Federal Rules of Criminal Procedure, 18 U.S.C.A., which provides that "A warrant shall issue only on affidavit sworn to before the judge or commissioner and establishing the grounds for issuing the warrant" for their holdings that probable cause must be determined exclusively on the contents of the affidavit for the warrant. When the Supreme Court in Whiteley v. Warden, Wyoming State Penitentiary, *supra*, stated in Footnote 8 that "Under the cases of this Court, an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought

the warrant *but not disclosed to the issuing magistrate*" (Italics supplied) the Court referred to its language in Aguilar v. Texas, *supra*, above quoted, and Giordenello v. United States, *supra*, that the court must look to the record —beyond the affidavit—to determine probable cause. When the challenged search was conducted in Whiteley v. Warden, Wyoming State Penitentiary, *supra*, Rule 40(c), Wyoming Rules of Criminal Procedure provided, inter alia, that "a warrant shall issue *only* on affidavit sworn to before the judge or commissioner and establishing the ground for issuing the warrant." (Italics supplied). Article 18.01 of the Vernon's Ann. Texas Code of Criminal Procedure applied in Aguilar v. Texas, *supra*. It provided that no search warrant shall issue unless a sworn complaint shall be first filed setting forth sufficient facts to satisfy the magistrate that probable cause exists. In Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) the Supreme Court held that the Fourth Amendment's proscriptions are enforced against the States through the Fourteenth Amendment and that the standard of reasonableness is the same under the Fourth and Fourteenth Amendments. In Fourth Amendment cases findings of reasonableness or of probable cause necessarily rest on the facts and circumstances of each particular case. Aguilar v. Texas, *supra*, 378 U.S. at 118, 84 S.Ct. 1509.

█ In addition to his affidavit, Miller presented to Cocke the sworn statement of Fred J. Schupbach and the counterfeit $100 bill. Miller, an expert, identified the bill as counterfeit and informed Cocke that he received it from Schupbach. Miller related to Cocke that he had made extensive inquiries of Schupbach and had traveled with Schupbach to view the Kidd residence. Miller spoke with Schupbach's superiors at Fort Sill concerning Schupbach's reliability before presenting the evidence to Commissioner Cocke. Cocke asked extensive questions of Miller concerning all matters involved in the case. Probable

cause requirements were met. Miller spoke with personal knowledge of the counterfeit bill, and of Schupbach from whom he received it. He clearly indicated the sources of his belief. He related sufficient basis upon which Cocke could, and did, find probable cause. Giordenello v. United States, *supra;* United States v. Arms, 392 F.2d 300 (6th Cir. 1968). The denial of the motion to suppress was proper.

■ Appellant argues that the court erred in overruling his motion for judgment of acquittal to the charge of conspiracy. Leeper contends that the record is devoid of proof of an agreement to commit the offense to defraud or that any overt act was performed in pursuance thereto. Leeper was charged with having conspired with Shirley Burghart and Grady Roskam under Title 18, U.S.C. § 371 with intent to defraud by unlawfully and wilfully concealing and keeping in his possession certain forged and counterfeit notes of the United States with intent to utter, pass and publish the same. The indictment charged specific overt acts during the period May 3–5, 1970.

The gist of a conspiracy is an agreement among conspirators to commit an offense, attended by an act of one or more of the conspirators to effect the object of the conspiracy. United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); Carter v. United States, 333 F.2d 354 (10th Cir. 1964); Carlson v. United States, 249 F.2d 85 (10th Cir. 1957). The record discloses ample evidence of a plan or scheme entered into between Leeper, Burghart and Roskam. Kidd and Schupbach testified at great length about the plan discussed by Leeper and Burghart while in the Kidd residence with respect to passing the counterfeit bills. Kidd testified with respect to transactions which occurred on May 4, 1970 involving Leeper, Burghart and Roskam which, if believed, constituted one or more overt acts in fulfillment of the conspiratorial scheme. There was an abundance of evidence from which the jury, as it did, could find that a plan or scheme to defraud was devised by Leeper, Burghart and Roskam.

■ Appellant contends that the trial court committed prejudicial error in overruling objections to certain cross-examination conducted of him. On direct examination, Leeper testified relative to his activities on May 3 through 5, 1970, involving trips which he made between Oklahoma City, Carnegie, Chickasha and Lawton, Oklahoma, in a Chevrolet pickup. On cross-examination, Leeper was asked whether this was the same Chevrolet pickup that he had while staying at a motel in Little Rock, Arkansas on April 29, 1970, then accompanied by Burghart and Roskam. Leeper had previously testified that he, Burghart and Roskam and left Oklahoma City for Little Rock, Arkansas on April 20, 1970. He was asked a series of questions concerning his whereabouts between April 20, and May 3, 1970, on cross-examination. He responded that he, Burghart and Roskam had gone to Little Rock, Arkansas, then to St. Louis, Missouri, and then back to Little Rock and on from there to Oklahoma City. He acknowledged that they had met certain named persons at certain locations during this period. It is contended that this cross-examination went beyond the scope of direct and was pursued for the purpose of prejudicing the jury against Leeper. Appellant claims prejudice simply on the basis that these particular trips and contacts were never connected to issues in the case. Leeper testified on direct examination that he had no knowledge of, nor had he at any time been in possession of, counterfeit notes. He testified further, however, that he had received $20 from Shirley Burghart after she had passed a counterfeit $100 bill in Lawton, Oklahoma on May 4, 1970, and that Burghart gave him the money because he was "about broke". The cross-examination relating to the trips was permissible and within the discretion of the trial court in light

of the fact that Leeper had no visible means of support and yet he traveled extensively from April 20, 1970 until his arrest in Carnegie on May 5, 1970. In addition it established a pattern of companionship and communication involving Leeper, Burghart and Roskam. There is no showing of prejudice. Only those errors which affect substantial rights are prejudicial. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

■ The trial court has broad discretion in setting the limits of cross-examination. It may embrace any matter germane to the direct examination, qualifying or destroying it, or tending to elucidate, modify, explain, contradict or rebut testimony given in chief by the witness. Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); Marteney v. United States, 218 F.2d 258 (10th Cir. 1955), cert. denied 348 U.S. 953, 75 S.Ct. 442, 99 L.Ed. 745 (1955); Arnold v. United States, 94 F. 2d 499 (10th Cir. 1938); Minner v. United States, 57 F.2d 506 (10th Cir. 1932); Christianson v. United States, 226 F.2d 646 (8th Cir. 1955).

We affirm.

LEWIS, Chief Judge (concurring specially).

As the main opinion correctly and specifically holds, the search of the subject premises was authorized as a consent search. Having so held, I consider it unnecessary to resolve the argumentative validity of the search warrant. The fact that Agent Miller may have placed partial subjective reliance on the warrant for his search is of no consequence, Green v. United States, 10th Cir., 386 F.2d 953, and I do not consider this case to otherwise present a situation indicating a need for anticipatory guidelines.