UNITED STATES of America,
Plaintiff,

v.

Melvin L. LELAND, Defendant.

Crim. A. No. 74-2.

United States District Court,
D. Delaware.

June 14, 1974.

Ralph F. Keil, U. S. Atty., and John H. McDonald, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

John J. Schmittinger, of Schmittinger & Rodriguez, Dover, Del., for defendant.

## OPINION AND ORDER

LATCHUM, Chief Judge.

The defendant Melvin L. Leland ("Leland") has been charged in a one-count indictment with knowingly transporting a stolen vehicle between New York, New York and Glasgow, Delaware in violation of 18 U.S.C. § 2312. Leland has moved to suppress certain statements made to Delaware state police officers and FBI agents and physical evidence seized by state police officers and FBI agents around the time of his arrest.

The background facts developed at the suppression hearing are as follows: On November 20, 1973 State Trooper Thomas Noonan ("Noonan") while on patrol received a call at 2:26 A.M. to investigate a complaint that a drunk had passed out in the Sherwood Diner, which is situated at the intersection of Routes 40 and 896 at Glasgow, Delaware. (Tr. 4–5).[1] Noonan arrived four minutes later. (Tr. 6). A waitress pointed to Leland who was seated on a stool slumped over the counter with his head cradled in his arms. (Tr. 6–7). Noonan woke Leland by shaking him, and identified himself as a police officer. (Tr. 7–8). Leland's

---

1. "Tr." refers to the suppression hearing transcript.

breath smelled of alcohol and according to Noonan he appeared to be "borderline drunk." (Tr. 8).

Noonan told Leland he could not sleep in the diner and asked him if he had an automobile. (Tr. 8–9). Leland answered that his car was at a Gulf gasoline station nearby. (Tr. 13). The Gulf station referred to is about 200 feet from the diner on the opposite side of Route 40. (Tr. 14). Noonan asked Leland if he wanted to sleep it off in his car and Leland agreed. (Tr. 13). Noonan told him he would drive him over to the Gulf station and did so. (Tr. 13).

On arrival at the station Noonan discovered that the car, a 1973 Cadillac bearing New York license plates, was locked. (Tr. 18). Leland told Noonan that the station attendant had the keys, and Noonan obtained the keys from him. (Tr. 19). The car was located behind the station where there was very little illumination at that hour. (Tr. 112).

Leland then got into the car. Noonan noticed that the left front wheel and fender had been damaged as if the car had struck something. (Tr. 21; 23). In response to Noonan's inquiry, Leland could not recall exactly where the accident had occurred except that it was somewhere on Interstate Route 95. (Tr. 25). Noonan then returned the keys to the station attendant. Noonan attempted to make a routine inquiry by radio to the National Crime Information Center ("NCIC") to determine whether the license plates had been reported lost or stolen. (Tr. 28). He was informed that NCIC was not operating at the time. (Tr. 30).

Noonan then received a dispatch to investigate another complaint at Salem Village. (Tr. 30–31). He left the Gulf station at about 2:41 A.M. (Tr. 31). While at Salem Village, Noonan received a report that NCIC had gone back into operation and that the license plates on the Leland car had been reported lost or stolen. (Tr. 32). Noonan returned to the Gulf station and another vehicle

driven by state police Sergeant Whaley ("Whaley") was sent as his back up. (Tr. 33–34). The two arrived almost simultaneously about 3:13 A.M. (Tr. 34).

The first thing Noonan did was to shine his flashlight through the windshield to read the Vehicle Identification Number ("VIN") from the plate located on the dashboard of Leland's car. (Tr. 34–35). Noonan then radioed the dispatcher to run a NCIC check on the VIN. (Tr. 39). Noonan was informed at that time that NCIC was once again inoperative. (Tr. 39).

One of the officers then obtained the car keys from the Gulf station attendant. (Tr. 39). When Leland did not respond to their knocks and shouts, they unlocked the door and shook him awake. (Tr. 39). Leland was asked for his operator's license and vehicle registration card. (Tr. 39). The registration card indicated that the Cadillac was registered in the name of David E. Mathias. The officers compared the numbers on the registration card with those on the VIN plate. (Tr. 40). Noonan read the numbers off the card while Whaley looked at the VIN plate through the windshield. (Tr. 41). The numbers matched. (Tr. 41). The officers asked Leland a few questions and he answered that the owner of the car was a friend of his, that he had borrowed the car for a few weeks, and that he was traveling from New York City to North or South Carolina. (Tr. 97–98). The officers concluded that since the registration car number appeared valid and since Leland had a plausible explanation there must have been a mix-up in the NCIC records, (Tr. 98), and they left the scene in their separate vehicles. (Tr. 48). They had scarcely pulled away when a radio call from the dispatcher informed them that NCIC reported that a vehicle with the VIN Noonan had radioed in had been reported stolen. (Tr. 48). Both Noonan and Whaley immediately returned to the station. (Tr. 49). Leland was again awakened, physically removed from the vehicle and read his *Miranda* rights. (Tr. 49–50). Whaley reexamined the

registration card in the illumination of the headlights of his own vehicle and noticed some obvious strikeovers in the digits of the number. (Tr. 106–107). Leland was told he was going to be held under a two hour detention because the car was reported stolen. (Tr. 104). The officers then asked if he had any objection to their looking at any additional papers in order to try to resolve the matter. (Tr. 116–117). When Leland agreed, Noonan took some papers from the glove compartment and from the front floorboard. In addition an attache case on the rear seat was opened to make sure there were no weapons within Leland's immediate reach. (Tr. 117). The contents of the case were not otherwise examined. (Tr. 117).

Leland told the officers that the "mix-up" in registration numbers resulted because there was another set of plates on the car when he had borrowed it and he had replaced them with the present ones. (Tr. 119). He told the officers the license plates were in the trunk along with some personal gear that he wanted. Leland opened the trunk and handed the officers a brown bag containing two New York registration plates. (Tr. 119). The officers then arrested Leland for violating 21 Del.C. § 2115(2) which prohibits the display of false, fictitious, or altered registration cards. (Tr. 51). About 4:00 A.M. Leland was taken to State Police Troop 2 and *Miranda* rights were once again read to him. (Tr. 63). Then Leland reiterated his story that he had borrowed the car two weeks previously with the owner's permission and was driving from New York City to one of the Carolinas. (Tr. 63–64). At 7:00 A.M. Leland was taken to Magistrate's Court Number 11 for arraignment on the state charge placed against him. (Tr. 64). The Magistrate refused to hear the matter because Leland appeared to be still intoxicated at that time. (Tr. 65). Under standard operating procedure Leland was then taken to Troop 6 for a period of eight hours to sober up.

(Tr. 65). At 10:00 A.M. FBI Special Agent Raymond F. Leonard ("Leonard"), acting on information supplied by Noonan, filed a complaint with the United States Magistrate and a warrant was issued in the afternoon. (Tr. 81; 84). At about 1:00 P.M. Leonard attempted to interview Leland but was unable because Leland could not be awakened. (Tr. 85). Leland was taken before the United States Magistrate at about 7:00 P.M. on November 20th and committed to the Delaware Correctional Center at Smyrna ("Smyrna") in default of bail. (Tr. 84). Sometime between 7:00 A.M. and 7:00 P.M. the charge before the state magistrate was *nolle prossed* at Magistrate Court 11. (Tr. 67).

About 12 Noon of November 21, Leonard and Special Agent Pearthree interviewed Leland at Smyrna. (Tr. 86). Leonard obtained a signed Waiver of *Miranda* Rights form from Leland before questioning him. (Tr. 87). Leland informed the agents that he had borrowed the car from Johnny Smith in New York City about a week before, and that he was going to South Carolina to visit relatives. (Tr. 89). He also stated that there was information in the black attache case in the Cadillac that would help explain how the car was in his possession. (Tr. 90). He asked them to look into the attache case and also to bring him back some suitcases and shoes from the car. (Tr. 90). Leonard proceeded to the car, which was still at the Gulf station, opened the attache case on the back seat of the car, and found a car invoice from Lewis Motor Sales of Newark, New Jersey in the name of John Smith for a 1973 Cadillac marked paid in full, a pad of car invoices from the Lewis Motor Sales Corporation in Newark, New Jersey, a stamp bearing the name of Albert M. Murray, Notary Public, Sussex County, New Jersey, a small rubber date stamp, a large rubber numeral stamp, a bottle of Carter's black ink, an eraser, a regular stamp pad, a small stamp pad, and a copy of a car invoice concerning a 1971 Chevrolet. (Tr. 91).

Leland alleges various violations of his constitutional rights from the moment he was awakened in the Sherwood Diner to the discovery of the above items in the attache case. The Court will treat each allegation *seriatim*.

█ 1. Leland contends that he should have received *Miranda* warnings as soon as he was awakened by Noonan in the Sherwood Diner so that any incriminating statements made by him prior to the time he actually did receive the warnings are not admissible into evidence and should be suppressed. What he particularly desires to have suppressed is his statement that he had a vehicle at the Gulf station across the highway from the diner. Leland argues that there is no other evidence establishing that he was in possession of the Cadillac so that his statement of possession is an important link in the chain of evidence that the Government needs to prove its case. In Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court stated that before a law enforcement officer can subject a citizen to custodial interrogation, he must first be given *Miranda* warnings. "Custodial interrogation" was defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444. What distinguishes custodial from noncustodial interrogation has been the subject of considerable judicial comment. The Third Circuit Court of Appeals in United States v. Jaskiewicz, 433 F.2d 415 (C.A. 3, 1970), cert. den. 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971) has stated that the most important consideration for determining whether interrogation is custodial is to determine whether the governmental agent has in some meaningful way subjected the suspect to physical, or perhaps psychological, restraint. Id. at 419. The Court concludes that under *Jaskiewicz* standard a custodial interrogation did not take place at those times necessitating the giving of *Miranda* rights.

Leland places great reliance on the fact that Noonan shook him awake and drove him to the Gulf station in a marked police car. However as Noonan testified, these actions were not done with any intent to investigate a crime, but in order to place Leland where he could safely sleep off his intoxication. While it is true that Noonan could have taken Leland into custody and placed him in a detoxification center for public intoxication, 11 Del.C. §§ 1315, 4210, he testified that normally an intoxicated person will be allowed to sleep it off in his car, or will be driven home if he lives nearby in lieu of arrest. (Tr. 11). Leland argues that he had no choice but to go with Noonan so that he was subject to physical or psychological restraint, necessitating the giving of *Miranda* warnings before any questions could be asked. However, Leland was not being restrained in the sense that he was in custody. Noonan was imposing three restraints on Leland's activities. Noonan would not permit him to remain at the diner because that establishment had complained about his condition and presence; Noonan would not allow him to walk on the highway because in his state he would be a danger to himself; and he would not permit him to drive his car because he would be a danger to himself and to others. If Leland had lived nearby, he could have been driven home; if he had friends nearby he could have been driven to their home or they could have picked him up; if Leland had been registered at a motel he could have been driven there. As it happened, however, none of these alternatives was open to Leland. The only alternative remaining after Noonan had imposed the restraints for Leland's own safety was for him to sleep it off in his car. Noonan drove him to his car, saw to it that he got in and then left. Noonan's departure clearly indicates that the restraints, if they can be so called, were only imposed for the short period necessary to ensure that Leland was safely in his vehicle. If Noonan had been suspicious that Leland had been involved in a possible car theft,

it is unlikely that he would have permitted Leland a chance to escape. While Noonan had suggested that he sleep it off until morning, there was no restraint on Leland once Noonan left. Presumably he could have gotten the key from the attendant, he could have walked away, he could have hitchhiked, or he could have called a cab. In short, there was no restriction on Leland's movement other than perhaps the possible immobility of Leland's car which resulted from the accident damage and that was not imposed by Noonan.[2] Therefore, Leland was not subject to any physical or psychological restraint, the "interrogation" was not a custodial interrogation within the meaning of *Miranda,* and no warnings were needed before Leland was asked whether he had a car in the neighborhood.

■ 2. Leland argues that Noonan's obtaining of the Cadillac's VIN by shining a flashlight through the windshield in order to read it was a warrantless search for which there was no justification because there had been no arrest and the vehicle was immobilized. Leland relies on Glisson v. United States, 406 F.2d 423 (C.A. 5, 1969) as support for his position. However in *Glisson* the VIN was located on the door panel necessitating the opening of the car door to obtain it. In the instant case no physical intrusion took place in order to read the VIN since it was in plain view on the dashboard. Moreover the Fifth Circuit *en banc* expressly overruled *Glisson* in United States v. Johnson, 431 F.2d 441 (C.A. 5, 1970), holding that an inspection of a motor vehicle performed by police officers who were entitled to be on the property where the vehicle is located which in no way damages the vehicle and is limited to determining the VIN is not a search within the meaning of the Fourth Amendment. The obtaining of the VIN in the instant case complies with the standards of *Johnson,* and

in fact did not involve even the limited intrusion of opening the door to check the VIN that was present in *Glisson.* Therefore the Court holds that no search occurred within the meaning of the Fourth Amendment when Noonan read the VIN through the windshield.

■ 3. Leland contends that the searches by the officers of his glove compartment and trunk after the *Miranda* warnings were given were a violation of his Fourth Amendment rights because he was not warned that he need not submit to a search of his vehicle, relying on United States v. Moderacki, 280 F.Supp. 633 (D.Del.1968). The notion that a suspect must receive specific warning of his right to refuse a search has been rejected by the Third Circuit Court of Appeals in Government of Virgin Islands v. Berne, 412 F.2d 1055 (C.A. 3, 1969), cert. den. 396 U.S. 837, 90 S.Ct. 96, 24 L.Ed.2d 87 (1969) and more recently by the Supreme Court in Schneckloth v. Bustamonte, 412 U.S. 218, 231, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).[3] While the burden is on the Government to show that consent was freely and voluntarily given, Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), voluntariness is to be determined from the totality of the surrounding circumstances. Knowledge of a right to refuse consent is a factor to be considered, but the Government need not prove that the suspect knew he had a right to withhold his consent. *Schneckloth,* supra at 248–249. In that case, the Court stated that there could be no consent where there was explicit or implicit coercion, by implied threat or covert force. Id. at 228. At the time the two officers asked Leland whether they might look in his glove compartment, they had already received reports from NCIC that both the license plates and the vehicle itself had been reported stolen. Unless Leland provided a satisfactory explanation they had ample

---

2. The vehicle was probably not completely immobilized since Leland had driven it to the gas station from wherever the accident had occurred.

3. In fact Moderacki was specifically rejected in *Schneckloth,* 412 U.S. at 231 n. 13.

grounds for arresting him. Therefore when the officers asked if he minded them looking in the glove compartment to see if the mix-up of numbers could be straightened out, he naturally was agreeable since something exculpatory might turn up which would save him from arrest. Therefore his consent to this search was freely and voluntarily given.

▪ As for the search of the trunk, Leland affirmatively stated that he had physical evidence in the trunk that would explain the discrepancies. Leland went to the rear of the car, opened the trunk, and, after pausing to permit Whaley to ascertain whether there were any weapons obviously within sight, reached in and handed Whaley a brown paper bag containing a second set of license plates. (Tr. 119). The Court has considerable question as to whether this can be considered a police search at all, since the entire operation was initiated and performed by Leland himself. If it was a police search, Leland clearly consented to it.

▪ Leland also argues that his consent to the search, if given, was ineffective, because his intoxication rendered him incapable of making a rational decision. In Gladden v. Unsworth, 396 F.2d 373, 380–381 (C.A. 9, 1968), the court stated with regard to a confession that if by reason of extreme intoxication, the confession in fact could not be said to be the product of a "rational intellect and a free will,"[4] the confession was not voluntarily given. This standard for determining when voluntary consent to police action will be impossible because of intoxication is equally applicable to consent to a search. The question then is, was Leland so intoxicated that his consent to the search was not the product of a rational intellect and a free will? The Court finds that Leland was not intoxicated to that extent. Concededly he was intoxicated to the extent that he

was unfit to drive, was unsteady on his feet and difficult to rouse. However, he still possessed sufficient intellect to recount a story plausible enough to the officers that they were content to leave him *even after* the NCIC report had reported the license plates as lost or stolen. (Tr. 97–98). Even after the officers returned for the third time, Whaley testified that Leland's explanations were still somewhat plausible despite the fact that by that time they had also received a report that the vehicle itself had been reported as stolen. (Tr. 106). Leland was rational enough to understand the charge against him, to offer a plausible explanation, and to locate physical evidence in an attempt to back up his explanation. Therefore the Court concludes that Leland was rational at the time of the search of his car so that his consent was the product of a rational intellect and a free will.

▪ 4. Leland complains that following his arrest he was held for 17 hours before being taken for a preliminary hearing before the United States Magistrate. He asserts that he was effectively in Federal custody during that time because the state police were acting as agents of the Federal Government by holding him until the arrival of the Federal authorities. Leland claims that the long period of Federal custody prior to the preliminary hearing (from 2:30 A.M. to 7:00 P.M.) renders inadmissible the statements given to Noonan at Troop 6. As support Leland cites McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) which hold that an arrested person must be taken before a committing magistrate without unnecessary delay. However, all of Leland's statements prior to the preliminary hearing before the United States Magistrate were made between 2:30 A.M. and 7:00 A.M. (Tr. 64).

---

**4.** This language was taken from the general test for the voluntariness of a confession laid down by the Supreme Court in Town-

send v. Sain, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963).

Even assuming that Leland was in effect in Federal custody, under 18 U.S.C. § 3501(c), the statutory codification of the *McNabb-Mallory* rule, statements made within six hours of the arrest or other detention are not inadmissible as evidence solely because of delay in bringing the suspect before a magistrate. Thus, Leland's statements to Noonan, made within six hours of his initial detention, will not be suppressed as a violation of the *McNabb-Mallory* rule and its statutory codification.

■ 5. Leland charges that the written Waiver of Rights which he signed before Leonard questioned him was invalid because the *Miranda* warnings contained thereon were insufficient. Specifically he charges that the statement "Anything you say can be used against you in Court" is insufficient, and that it should read "Anything you say can *and will* be used against you in Court." Leland cites United States v. Fox, 403 F.2d 97 (C.A. 2, 1968) to support his contention. That case, however, stands for no such proposition. The language contained on the FBI's Waiver of Rights form tracks the language used in *Miranda* itself, and for that reason the Court deems that it meets the *Miranda* standards.

■ 6. Leland urges that Leonard's search of the black attache case located on the back seat of his automobile was invalid because no warrant was obtained nor did he give his consent to the search. However, the evidence is uncontradicted that Leland told Leonard the story about borrowing the car from a Johnny Smith (Tr. 89) and further told him he would find evidence in the attache case explaining the mix-up. (Tr. 90; 93). Leonard did go to the car, and open the attache case where he found the evidence previously referred to. (Tr. 90–91). The facts clearly establish free and voluntary consent to that search, and in fact, establish that Leonard went to the car at Leland's urging. Furthermore, since this interview occurred on November 21st, more than 24 hours after Leland had been drinking, there is no question that Leland's con-

sent was the product of a rational intellect and free will. The evidence uncovered by Leonard's search of Leland's attache case will not be suppressed.

7. Lastly, Leland contends that he was the victim of a subterfuge arrest because the authorities arrested him on a charge they had no intention of prosecuting, i. e., the display of an altered vehicle registration card, when in reality they were using the charge merely as an excuse to hold him for federal authorities. Leland argues that since he was the victim of a subterfuge arrest, the arrest was invalid, and everything that followed, all incriminating statements and all physical evidence seized, must be suppressed as tainted by the subterfuge arrest.

Leland relies mainly on Green v. United States, 386 F.2d 953 (C.A. 10, 1967). In *Green*, police officers observed several individuals driving slowly past financial business institutions. Although suspicious, the police had no probable cause to arrest. When two of the individuals emerged from the car, they were arrested for vagrancy and a search of their persons pursuant to the arrest turned up stolen United States Postal Money Orders. The court suppressed the evidence obtained from the search on the ground that the vagrancy ordinance could not be used as a shortcut to the due process requirement of probable cause. In other words, an arrest on sham charges cannot be used as justification for a search where probable cause to search is otherwise lacking.

■ In the instant case, however, when Leland was arrested on the state charge, the police had probable cause to believe that he was guilty of transporting a stolen vehicle in interstate commerce. They chose to arrest him on state charges because they had some question as to the procedure to follow when arresting for a violation of federal charges. Leland contends that the state charge of displaying a false or altered registration card is not applicable to vehicles registered in another state. Even assuming that to be true, the Court believes it is beyond contro-

versy that a state law enforcement officer can detain and arrest an individual for a federal violation if he has probable cause to believe the individual committed the offense. Furthermore, it would appear that the officers had probable cause to charge Leland with several possible violations of Delaware law. 11 Del.C. § 853 makes it unlawful to drive a vehicle without the consent of the owner; 11 Del.C. § 841 makes theft of property valued at $100 or more a felony; and 11 Del.C. § 851 makes it a felony knowingly to receive stolen property valued at $100 or more. While perhaps not all of these statutes were intended to apply to a car theft occurring in New York, arguable some of them do. Since the police had probable cause to arrest Leland on several possible grounds, there was no violation of his constitutional rights in arresting him for violation of a statute which may not have applied to his conduct. In short, the arrest was valid and the subsequent statements made by Leland and the items seized in the searches of his vehicle while he was in custody will not be suppressed.

Having found that none of Leland's grounds or arguments justify his motion to suppress, the motion will be denied.