Jacky Walter **YEARGAIN**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–74–627.

Court of Criminal Appeals of Oklahoma.

May 13, 1975.

As Corrected May 14, 1975.

Tim K. Baker & Paul E. Simmons, Tahlequah, for appellant.

Larry Derryberry, Atty. Gen., Bill Bruce, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Jacky Walter Yeargain, hereinafter referred to as defendant, was charged, tried and convicted for the offense of Burglary in the Second Degree, Case No. CRF–73–134, in the District Court, Cherokee County. His punishment was fixed at a term of five (5) years imprisonment in the state penitentiary, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial, Archie Brittain testified that he was employed as a police officer for the Tahlequah Police Department. On December 5, 1973, at approximately 1:45 a. m., he observed the defendant attempting to break into the back of Stauss' Drug Store. On seeing Officer Brittain, the defendant ran and hid underneath a hearse parked at a funeral home. Officer Brit-

tain pulled the defendant from beneath the hearse and upon searching defendant, the officer found $10.00 or $12.00 in change, a silver dollar and some keys. The money was turned over to Jack Lay of the Oklahoma State Bureau of Investigation.

Ray L. Weaver testified that he had known the defendant for practically all his life. On the night in question, he, the defendant, Hank Cookson, David Cookson and J. W. Glidewell were at the Weaver residence. Lindol "Hank" Cookson and J. W. Glidewell lived with him at the time. Everyone other than Weaver left and went to the Squeeze-In at approximately 9:30 p. m. and returned approximately two hours later. At about midnight the defendant and J. W. Glidewell left again, after discussing breaking into a pharmacy. They returned to his house approximately 45 minutes later carrying nine rifles and two pistols. They stated the guns were taken from Purdy's Sport Shop. The items were put in the attic.

David Cookson next testified to substantially the same facts as Ray L. Weaver. Cookson further added that he and J. W. Glidewell subsequently transferred the firearms from the attic to a cabin on the lake owned by Glidewell's father.

Gene Bolding testified that he was employed by the Tahlequah Police Department as Chief of Police, and that David Cookson showed him where the guns were located. The guns were on a screened-in porch and entry was made by unhooking a latch. He further testified he did not have a search warrant, nor permission from J. W. Glidewell to get the guns and he did not know, at the time, who owned the property. He identified the firearms in court as the ones he seized from the cabin.

Jack Lay, an agent of the Oklahoma State Bureau of Investigation, testified that while Officer Brittain was booking the defendant, he observed the officer take a quantity of change from the defendant's pockets, including a silver dollar. He sub-

sequently showed the silver dollar to Mr. Purdy who identified it.

John Purdy next testified for the State, stating that he was the owner of the building described in the Information and Purdy's Sport Shop housed therein. That on the evening of December 4, 1973, he closed the store for the day and securely locked the two back doors of the building, turned the night lights on and left the store through the front door. Later, about 2:00 a. m., that night he was called to the store by police officers, to the back doors, both of which had been battered and entrance made through the south door. Missing from the store were seven shotguns and two pistols (for which he had registered serial numbers), silver and other coins from the cash register, including one silver dollar on which he had engraved "J P." The next morning Officer Jack Ray showed him a silver dollar and he identified it as the one taken from the cash register the night of the burglary. Later, Purdy identified the guns and pistols at the police station by registered serial numbers, after they had been recovered by the police from a cabin at Wildcat Point on Tenkiller Lake. He authorized no person to break into and enter his store and remove the personal property therefrom.

For the defendant, Lindol "Hank" Cookson testified that he was the older brother of David Cookson and that the defendant showed him a silver dollar won in a pool game at the Squeeze-In. He further testified that the defendant and Glidewell left Ray Weaver's residence at approximately midnight. He observed guns at the house, but did not know how they had gotten there, nor did he hear a discussion about them.

The defendant took the stand in his own behalf. He testified that he arrived at the Cookson apartment[1] at approximately 11:00 or 11:30 p. m. and that during this time he played pool, won a silver dollar and drank quite a bit of beer. After leaving the Squeeze-In, they all returned to

---

1. The Cookson apartment and the Weaver residence are one and the same.

Cookson's apartment. Subsequently, he and J. W. Glidewell left to get some beer, but decided against this and returned to the apartment. After returning to the apartment, he decided to walk home and while walking home through an alley, a car turned into the alley and an individual, whom defendant did not know, started running. The defendant further testified that the car sped toward him and he became frightened and started running himself. He stated he hid under a hearse and came out when a policeman pointed a gun at him. He testified he was taken behind the drug store and beaten and searched. He stated that he "kneed" one officer in the crotch. He further testified he was only approximately 15 or 20 feet into the alley when the police arrived and not behind Stauss' Drug Store. He stated he was questioned by several people and urged to plead guilty so he could "get off lightly." The defendant closed his testimony by stating that he had won some of the money that he had on his person at the Cookson apartment, in a poker game.

Gene Bolding next testified for the defense. He identified some photographs of the defendant which had been taken by Jack Lay. He stated that he had filed no charges against anyone other than the defendant and J. W. Glidewell. The defense then rested.

The State, in rebuttal, called Archie Brittain who testified that he had checked the building and the alley between 11:00 and 11:30 p. m. on the night of the burglary and that if the doors had been damaged he would have noticed it.

John Purdy was called in rebuttal and testified that he saw the defendant at the police station on the night of the burglary, but had not spoken to him or offered him any deals. On cross-examination, Purdy stated that he did not remember saying anything to defendant, but that he might have.

Defendant's first proposition asserts that the trial court erred in not granting him a continuance. The record reveals the following sequence of events in this case.

Defendant was arraigned on February 28, 1974, and trial was set for March 19, 1974, at 9:00 a. m. On the day of the trial, defendant appeared with counsel and withdrew his plea of not guilty and entered a plea of guilty. Sentencing was set for the following day. The defendant appeared for sentencing with counsel and requested to withdraw his guilty plea and reenter a plea of not guilty. The trial court granted defendant's request and set the trial for the next morning. The following morning defendant apprised the court that he had learned the evening before that his attorney had talked with a State's witness and he believed his attorney and the witness had conspired against him. Defendant then requested the trial court to appoint him a new attorney and grant him a continuance. Based on defendant's dissatisfaction with his present attorney, the trial court allowed his attorney to withdraw and appointed the defendant two new attorneys. This occurred at 10:00 a. m. on the day of trial. Thereafter, at 1:00 p. m. on the day of trial, defendant's new attorneys moved for a continuance, which was denied, and the case went to trial resulting in defendant's conviction. The defendant now contends that his new appointed attorneys were not granted sufficient time to prepare for trial.

■ The granting or denying of a Motion for Continuance are matters within the sound discretion of the trial court, whose decisions are reviewable for abuse of discretion only. See Allcorn v. State, Okl.Cr., 392 P.2d 66 (1964) and Lamascus v. State, Okl.Cr., 516 P.2d 279 (1973). See also 17 Am.Jur.2d Continuance, paragraph 35, which states as follows:

"It lies within the trial court's discretion to grant or refuse a motion for continuance, where the accused's counsel withdraws from the case, or is discharged, and the propriety of a refusal of such a motion depends primarily upon whether

the accused was denied substantial justice. A continuance is properly denied if there is adequate time available to prepare a defense after the accused is informed that his original counsel will not appear, and a defendant must exercise due diligence in attempting to avert the adverse consequences of counsel's withdrawal by seeking a replacement, or otherwise. Clearly, an accused may not discharge or replace original counsel merely for the purpose of delaying the trial by a claim that new counsel has not had adequate time for preparation. If no harmful consequence resulted from denial of a continuance, there is no ground for complaint, and where the withdrawing or discharged counsel was adequately replaced and the defense properly presented, it is generally held that refusal of a postponement was not prejudicial to the accused. However, where it appears that the refusal of a continuance in fact operated to deprive defendant of a fair trial, a conviction may be reversed."

In the instant case, based on the record before us, it is our opinion that the defendant's request for a new attorney was merely for the purpose of delaying his trial. Further, we find that the newly appointed attorneys were competent members of the Oklahoma Bar Association; were given the aid of defendant's prior attorney, and properly presented the defendant's defense.[2] As there is no statutory or constitutional specification of time between appointment of counsel and trial, each case must stand or fall on its individual facts and circumstances. In the instant case we find no abuse of discretion in denying defendant's Motion for Continuance.

Defendant's second and final proposition asserts that the search of the cabin, which resulted in the seizure of certain firearms and later admitted in evidence at defendant's trial, was illegal and defendant's Motion to Suppress should have been sustained. In the case of Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L. Ed.2d 208 (1973), the Supreme Court of the United States stated:

"In deciding this case, therefore, it is sufficient to hold that there is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure. . . ."

In the instant case the defendant was not on the premises at the time of the alleged unlawful search and seizure; nor did the defendant have any proprietary or possessory interest in the cabin owned by Glidewell's father, where the guns were recovered and, as the defendant was charged and convicted for the offense of Burglary in the Second Degree, possession of the seized guns was not an essential element of the offense. Based on the above authority, we therefore conclude that the defendant did not have standing to contest the search of the Glidewell cabin, as Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. See Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). We, therefore, find this assignment of error to be without merit.

For all of the above and foregoing reasons, the judgment and sentence appealed from is accordingly affirmed.

BLISS, J., specially concurs.

BRETT, P. J., dissents.

BLISS, Judge (specially concurs):

I find not the slightest merit in defendant's first proposition that the trial court

---

2. The record reveals that the new attorneys, although they did not have benefit of the preliminary hearing transcript, did listen to the tape recording of the preliminary hearing prior to trial, and had these tapes available to them throughout the entire trial.

erred in not granting defendant a continuance of the trial. On Tuesday, March 19, 1974, defendant, with his original court-appointed attorney, appeared before Associate District Judge Lynn Burris and entered a plea of guilty to the crime charged in the Information, Burglary in the Second Degree, and at defendant's request pronouncement of Judgment and Sentence was passed to the next day, Wednesday, March 20, 1974, at 11:00 a. m. At the appointed time, the defendant and his said attorney appeared before the court, but asked to withdraw the plea of guilty, which the court permitted, entered a plea of not guilty and requested jury trial. The court then advised the defendant and his attorney as follows: "There will be a jury here at nine o'clock in the morning so have the defendant here and all of the witnesses so we can proceed to trial at that time. Mr. Yeargain, you need to be here at nine in the morning." To which the defendant answered, "I'll be here at eight." It appears that a jury term had been in progress and that this case was at the end or near the end of the term.

The record reflects the defendant then caused subpoenas to be issued to and served by the undersheriff for his witnesses to appear for trial, the next day, Thursday, March 21, 1974, at 9:00 a. m.

Immediately before the trial was to commence, as agreeably assigned, the defendant was present and permitted his said attorney to renew and present Motion to Suppress, heard as a Motion in Limine, which was overruled. The defendant, speaking for himself, then stated to the court, "I would like to make a motion for the trial to be postponed for me so that I could have equal time to get another attorney on the basis of conspiring with a witness against my defense . . . See, he went and talked to one of the people who is going to testify against me." There was no complaint that defendant was not ready for trial.

Although the record does not indicate the slightest impropriety by the court-appointed attorney, whom the defendant had seen questioning the prosecuting witness concerning certain aspects of the case, an absolute right of a defense lawyer, the trial judge in an apparent effort to appease the defendant, granted his request by appointing two other local attorneys to represent him, the originally court-appointed attorney voluntarily extending his help and services to his two successors in every way possible and was available to them throughout the trial. In effect, defendant had three court-appointed attorneys. This was at 10:00 a. m. and the trial court announced the trial would commence at 1:00 that afternoon and it did. The State used two of its witnesses in chief and during the testimony of the third witness, the court recessed until 9:00 a. m. the next day, Friday, March 22, 1974 when the trial was concluded. Every witness in the case, both for the State and the defense, lived at Tahlequah and all were available to the court-appointed defense lawyers during the overnight recess. There was no surprise State witness or witnesses. All witnesses called by the State in chief and rebuttal had testified in the preliminary examination and their testimony recorded by a court reporter and the tapes heard by the said lawyers and the court reporter was available to them at all times. During the trial, no occasion arose to attempt to impeach a State's witness on his testimony at the preliminary examination.

There was no abuse of discretion on the part of the trial judge. The defendant had a fair and impartial trial for which he was fully prepared and adequately and completely represented. The record in the case is such that the trial court could easily have determined, and no doubt did, that the defendant's request for the appointment of a different attorney was made in bad faith for only one purpose, the ultimate purpose to gain a continunace and delay of the trial of his case, possibly beyond the term. He was totally unwarranted in making his self-serving, false accusation against his first court-appointed attorney, a trustworthy, capable and competent attor-

ney, who was fully prepared for trial at the appointed time agreed upon by the defendant himself.

Lack of time for preparation for trial, as asserted by defendant, did not cause the defendant's conviction. He was convicted because the evidence in the case shows overwhelmingly his guilt. Not content with having committed the burglary charged and caching the valuable property taken, he returned to commit a second burglary the same night within a few hundred feet of the first and was caught red-handed by he police officers while in the act of trying to commit the second burglary and had on his person a quantity of coins, nickels, dimes, pennies and quarters and one roll of pennies and a silver dollar, engraved with the initials of the first victim, "J. P.", all taken during the burglary committed about an hour earlier. There could be no other verdict by the jury but guilty.

As to the proposition of asserted error arising from the search of the cabin in which the guns and pistols were found and seized, the defendant had, and has, no standing to question the search and seizure and the trial court did not commit error in overruling defendant's Motion to Suppress the evidence.

Assuming, however, the search and seizure invalid, the trial transcript shows the defendant guilty beyond a reasonable doubt without the introduction and benefit of the seized guns and pistols obtained by search of the cabin. The Supreme Court of Delaware[3] has stated the appropriate rule substantially as follows: Admission into evidence of item seized pursuant to invalid search was harmless error beyond reasonable doubt where evidence, exclusive of item seized, was sufficient to sustain conviction. Error in admission of evidence seized in violation of Fourth Amendment may be treated as harmless error under beyond-a-reasonable-doubt test and automatic reversal need not follow admission of illegally seized evidence if test is met. The Court cited in its opinion Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

The instant case meets the test without the slightest difficulty, and there is no merit in this proposition.

Accordingly, I concur.

BRETT, Presiding Judge (dissents).

I dissent to this decision because I believe a continuance should have been granted until the next day, at least. Also, the majority decision does not satisfy me that defendant lacked standing to challenge the unlawful search and seizure for the weapons introduced into evidence.