Albert TURNER, Jr., and Ward Edward
Jackson, Appellants,

v.

The STATE of Oklahoma, Appellee.

No. F–75–418.

Court of Criminal Appeals of Oklahoma.

Nov. 17, 1975.

Albert Turner, Jr., and Ward Edward
Jackson, pro se.

Larry Derryberry, Atty. Gen., James L.
Swartz, Asst. Atty. Gen., David O'Brien,
Legal Intern, for appellee.

OPINION

BUSSEY, Judge:

The appellants, Albert Turner, Jr., and
Ward Edward Jackson, hereinafter re-
ferred to as defendants, were charged,
tried and convicted in the District Court,

Kay County, Case No. CRF–75–13, for the offense of Robbery With Firearms, in violation of 21 O.S.Supp.1974, § 801. The jury fixed the punishment of each defendant at ten (10) years' imprisonment, and from each judgment and sentence a timely appeal has been perfected to this Court.

At the trial the first three witnesses to testify in behalf of the State were Robert L. Olsen, owner of the Red Dog Saloon in Newkirk, Kay County, Oklahoma, Eugene Russell Means and Vern Endicott, who were present at that tavern on the night of January 12, 1975. Considered together, their testimony tended to establish that shortly before closing time at 12:00 p. m. on that night the defendants entered the tavern and thereafter robbed the owner at gunpoint of about $300.00, consisting of currency, loose change, one roll of quarters and one or two rolls of nickels. One of the defendants removed the owner's loaded gun from a briefcase behind the counter, and defendant Jackson pointed the gun at the owner's head and demanded the money which was collected by defendant Turner. The defendants then left and told the witnesses not to try to follow them. The authorities were then summoned shortly after the defendants departed. The owner identified State's Exhibit No. 1 as containing his .357 Magnum pistol which had been removed from behind the bar.

Jeff Koenke and Brett Johnstone were the next two witnesses to testify for the State. While together in a pickup driven by Jeff Koenke shortly after midnight on January 12, 1975, these witnesses observed two black males push their stalled vehicle to the curb and into a light pole about one half block from the Red Dog Saloon. One of the black males then signaled the witnesses to stop and Jeff Koenke hesitatingly agreed to give them a ride a few blocks down the street. However, the black males then rather persistently endeavored to persuade the witnesses to take them to Ponca City and offered to buy the gas and give them some extra money. Brett Johnstone then explained that he would first

have to advise his father, and the parties proceeded a short distance to the home of Brett Johnstone's uncle where that witness exited the pickup and reported the incident by telephone to his father, Thomas "Danny" Johnstone, the local undersheriff. A few minutes later, Danny Johnstone arrived and while armed with a shotgun directed the black males to exit the pickup and frisked them. The black males then entered the undersheriff's vehicle and departed accompanied by the undersheriff. Later that night the witnesses searched the pickup driven by Jeff Koenke and discovered beneath the seat on the passenger side a .357 Magnum revolver and three one dollar bills which were subsequently released to Leslie Johnson, the local chief of police. Jeff Koenke identified defendant Turner as one of the black males, but neither witness could make further courtroom identification. State's Exhibit No. 1 was identified as containing a pistol similar to the gun discovered in the pickup.

Leslie Johnson, Chief of the Newkirk Police Department, next testified that in the early morning hours of January 13, 1975, he received a .357 Magnum pistol containing six cartridges together with three one dollar bills from Jeff Koenke and Brett Johnstone. State's Exhibit No. 1 was identified as containing those items and that exhibit was then admitted into evidence.

James Lenon, Kay County Deputy Sheriff, then testified that he processed the defendants upon their being booked into the Kay County jail on January 13, 1975, and incident to established processing procedures discovered a roll of money in the undershorts of defendant Jackson. The money was released to Danny Johnstone and amounted to $107.00 in currency, the same amount contained in State's Exhibit No. 2.

Thomas "Danny" Johnstone, Kay County Undersheriff, testified as the final witness for the State that in response to a telephone call from his son, Brett Johnstone, he proceeded to his brother's residence around midnight of January 12, 1975.

When he arrived there he directed the defendants to exit the pickup while he was armed with a shotgun. He then patted the defendants down and ascertained their names. They advised him that their car had broken down while they were going to Ponca City. The witness replied that they would go check the car, and if the car would run and the defendants were telling the truth they could proceed to Ponca City, but they were not going to ride with the two boys. After departing, the witness received a radio dispatch for assistance at the Red Dog Saloon and upon arrival there told the defendants to remain in his car and he would soon return. While inside the tavern, he was told that two black males had robbed or stolen the owner's money and pistol. He then returned to his car where he advised the defendants of their Miranda rights and, in response to his inquiry, the defendants stated that they had not been in the tavern. The defendants were then placed under arrest for grand larceny or till tapping and the parties proceeded to the courthouse. While en route, however, he received a radio dispatch to proceed to where the pickup previously occupied by his son, Jeff Koenke and the defendants was located. His son and Jeff Koenke there directed his attention to a pistol beneath the seat of the pickup. While then proceeding onto the courthouse, he again inquired whether the defendants had been in the tavern and one of the defendants replied that they had not taken any money and had only consumed a beer. At the county jail he searched defendant Turner incident to the arrest and discovered a roll of quarters and a roll of nickels in his pants pocket, together with $19.70 in change in his jacket pocket. After State's Exhibit No. 3 was identified as containing these items and State's Exhibit No. 2 was identified as the roll of currency received from Deputy James Lenon, both exhibits were admitted into evidence.

Defendant Turner then testified as the sole defense witness and generally acknowledged the circumstances surrounding the arrest of the defendants as previously set forth. However, he denied that either he or defendant Jackson had stated to Undersheriff Johnstone that they had been in the Red Dog Saloon and had consumed a beer, and further denied that they had ever been in the tavern. He explained that defendant Jackson and himself had left his mother and brother's wife in a cafe in Ponca City at about 10:00 on the night in question, but were to return and pick them up later that night at about 1:00 a. m. They then traveled in his car to Arkansas City, Kansas, where they engaged in some gambling. He explained that when subsequently arrested he had a large amount of change upon his person as a result of the gambling. While returning to Ponca City, they incurred engine trouble and drove into Newkirk, Oklahoma, to have the car checked at a service station. However, when the engine then ceased to operate the car was pushed to the curb and the defendants sought assistance.

The defense then rested and no evidence was introduced in behalf of the State in rebuttal.

In the first of their two assignments of error, the defendants contend that the trial court erred in overruling their motion to suppress the in court identification of themselves by the three witnesses present when the robbery occurred. This assignment is premised upon the proposition that the in court identification was tainted by pre-trial viewing procedures so unnecessarily suggestive that the defendants were deprived of a fair and impartial trial and due process of law.

The record reveals that prior to their preliminary hearing on February 7, 1975, some 26 days after the crime and four days prior to trial, Robert L. Olsen, Eugene Russell Means and Vern Endicott were permitted by Undersheriff Johnstone to view and examine two pictures of each defendant. The pictures had apparently been in the undersheriff's file on the case and were laying upon his desk while those witnesses were signing statements taken

previously. No other pictures were present and they depicted a front and side view of each defendant. After the witnesses had looked at the pictures, the undersheriff commented that the defendants had placed their hair in pigtails when the pictures were taken.

While conceding that they are not necessarily entitled to require a lineup, the defendants contend that the prejudicial effect of this viewing procedure was further compounded and emphasized by the denial of their reasonable request for a fair identification procedure. Defendant Turner testified that he requested a lineup two days after his arrest, and some time prior to the preliminary hearing the prosecuting attorney purportedly refused to conduct a lineup at the request of the defense attorney. Immediately prior to the preliminary examination, the court below then overruled the motion of the defendants that they be permitted to dress in street clothing and sit beside two other black males of similar physical characteristics during that hearing. When that motion was presented, however, defense counsel was apparently not aware that the witnesses to the robbery had been permitted to examine pictures of the defendants since he did not then bring this to the attention of the court.

The United States Supreme Court has repeatedly held that a pretrial identification procedure unnecessarily suggestive and conducive to irreparable mistaken identification *may* amount to a denial of due process and thus necessitate suppression of the tainted identification testimony. See, *Stovall v. Denno,* 388 U.S. 293, 87 S. Ct. 1967, 18 L.Ed.2d 1199 (1967); *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); and, *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L. Ed.2d 387 (1970). However, upon this issue that Court stated in *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), that:

"[W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. . . ."

In further discussing the scope of due process protection against the admission of evidence deriving from suggestive identification procedures in *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972), that Court observed "that the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'" As to the relationship between suggestiveness and misidentification, that Court there held:

"[T]he central question [is] whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. . . ." (409 U.S. 199, 93 S.Ct. 382)

Although the examination of the pictures of the defendants shortly prior to the preliminary hearing by the three eyewitnesses was unnecessarily suggestive, a careful examination of the record herein reveals that no substantial likelihood of irreparable misidentification resulted therefrom. The perpetrators of the robbery were present in the tavern for at least approximately 15 minutes. Prior to the robbery, Robert Olsen served them some beer and each of the eyewitnesses conversed or visited with them to some extent. Although lighting was principally provided by only a neon light near the cash register, each of the witnesses indicated they had a

good view. The in court identifications were made in unequivocal terms, and when specific inquiry was made both Robert Olsen and Eugene Means testified that they had no doubt as to the identity of the defendants. Robert Olsen had been in close proximity to the defendants near available lighting, and specifically testified that he identified them from his observation of their features at the time of the crime and not from the pictures. Eugene Means testified that he visited with the defendants about sports and where they were from. Although this witness later had some disagreement with one of the investigating officers and was arrested for public intoxication, he further testified that he again saw and recognized the defendants while being booked into the Kay County Jail later that night. Additionally, only about one month elapsed between the crime and the trial of this case. Under the totality of the circumstances here presented we are therefore persuaded that the identification was reliable even though the viewing of the pictures was suggestive. See, *Neil v. Biggers,* supra, *Mallard v. State,* Okl.Cr., 490 P.2d 1383 (1971), cert. denied 409 U.S. 912, 93 S.Ct. 239, 34 L.Ed.2d 173; and, *Gonzales v. State,* Okl.Cr., 480 P.2d 930 (1970). In support of this proposition the defendants cite *Willis v. State,* Okl.Cr., 482 P.2d 623 (1971), however, that case is readily distinguishable for the reason that the record there indicated that the in court identifications were the result of the witnesses being shown a photograph of the defendant prior to trial. Further this Court has previously held that an accused has no vested right to a lineup prior to in court identification, and the defendants' motion prior to preliminary hearing was here tantamount to a request for lineup identification during that hearing. See, *Roberson v. State,* Okl.Cr., 483 P.2d 353 (1971), and *Grigsby v. State,* Okl.Cr., 496 P.2d 1188 (1972). We therefore conclude that this assignment of error is without merit.

In their final assignment of error, the defendants assert that the trial court erred in overruling their motion to suppress State's Exhibits Nos. 1 through 3, as the fruits of an illegal arrest. This assignment is predicated upon the proposition that the arrest of the defendants was effectuated without probable cause when Undersheriff Johnstone first came into contact with them, and the fruits of an unlawful arrest cannot be employed to purge the illegality of the taint already attached.

■ We first consider the admissibility of State's Exhibit No. 1, containing the .357 Magnum revolver, six cartridges removed therefrom and three one dollar bills, found beneath the seat of the pickup driven by Jeff Koenke and also occupied by Brett Johnstone. As previously discussed, these items were discovered by those lay witnesses sometime after the defendants had been permitted to ride in the vehicle. We first observe that this was not a search and seizure within the ambit of the Fourth Amendment to the United States Constitution, as the record before this Court reveals that the same was conducted by private individuals without instigation or participation by law enforcement authorities. See, *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048, 13 A.L.R. 1159 (1921); *United States v. Harding*, 475 F.2d 480 (10th Cir. 1973), vacated on other grounds, 414 U.S. 964, 94 S.Ct. 274, 38 L.Ed.2d 211; *Reed v. State*, 50 Okl.Cr. 287, 297 P. 327 (1931); and Annot. 36 A.L.R.3d 553. Additionally, however, we are of the further opinion that the defendants were without standing to contest the search and seizure. In *Brown v. United States*, 411 U.S. 223, 229–230, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208 (1973), the United States Supreme Court held:

"In deciding this case, therefore, it is sufficient to hold that there is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as

an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure. . . .

\* \* \* \* \* \*

". . . 'Fourth Amendment rights are personal rights which, like some other constitutional rights may not be vicariously asserted. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L. Ed.2d 1247 (1968); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L. Ed.2d 697 [78 A.L.R.2d 233] (1960).' *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969). . . ."

Also see, *Yeargain v. State*, Okl.Cr., 535 P.2d 693 (1975), and Annot. 78 A.L.R.2d 246. The defendants argue that they were removed from the vehicle incident to an unlawful arrest, however, the search resulting in the discovery of State's Exhibit No. 1 was not conducted incident to that arrest but sometime later by private individuals without police involvement. The defendants had no proprietary or possessory interest in the vehicle nor did they assert any interest in the items discovered therein. As to State's Exhibit No. 1, we are therefore of the opinion that this proposition is clearly without merit.

█ We turn now to consider the admissibility of State's Exhibits Nos. 2 and 3, containing the money discovered upon the defendants while being booked into jail. The State argues that the initial detention of the defendants was justified under the "stop and frisk" doctrine. See, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and Annot. 32 L.Ed.2d 942. The State then concludes that the undersheriff gained probable cause for a felony arrest while at the tavern, and these exhibits were subsequently discovered upon a full personal search incident to a valid custodial arrest. See, *Hughes v. State*, Okl. Cr., 522 P.2d 1331 (1974). The defendants argue that an arrest was effectuated with-

out probable cause after they were first approached by the undersheriff and their liberty restrained. See, *Henry v. State*, Okl.Cr., 494 P.2d 661 (1972). Among other decisions of this Court, the defendants then cite *Rainbolt v. State*, 97 Okl.Cr. 164, 260 P.2d 426 (1953), for the proposition that an arrest cannot be justified by reference to subsequent discoveries. However, in each of those decisions the evidence that would justify a warrantless arrest was obtained by exploitation of the original unlawful arrest, without an intervening basis for lawful arrest independent of the primary illegality. We can perceive no legitimate reason why the illegality of an initial arrest should preclude an otherwise valid second arrest. See, *Carter v. State*, 236 Md. 450, 204 A.2d 322 (1964).

A transcript of the proceedings had upon the defendants' motion to suppress is not before this Court. However, the defendants do not contend that the undersheriff failed to obtain probable cause for a felony arrest after arrival at the tavern, by ascertaining that a felony had been committed and presumably a description of the suspects. Additionally, the undersheriff had information that the defendants were observed pushing their stalled vehicle within one half block of the tavern shortly after the crime late that night, and that the defendants rather anxiously then sought to leave town and abandon their stranded vehicle when permitted to ride a short distance in the vehicle of another. Further, the undersheriff could reasonably conclude that the defendants then concealed a pistol in the vehicle in which they were riding as passengers upon being approached by himself. Assuming arguendo that the defendants were actually arrested after first being approached by the undersheriff, all of the foregoing evidence arose from sources entirely independent thereof without exploitation of the primary illegality and prior to the search of the defendants that resulted in the discovery of State's

Exhibits Nos. 2 and 3. In *Brown v. Illinois*, —— U.S. ——, 95 S.Ct. 2254, 45 L.Ed. 2d 416 (1975), the United States Supreme Court recently held that the mere giving of the Miranda warnings does not dissipate the taint of a defendant's illegal arrest and render admissible statements given while under unlawful arrest. However, in discussing the extent to which the exclusionary rule protects Fourth Amendment rights from infringement under the "fruit of the poisonous tree" doctrine, the Court there rejected a "but for" rule and approved the following language from *Wong Sun v. United States*, 371 U.S. 471, 487–488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963):

> " . . . We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959). . . ." (Footnote omitted)

Also see, *Johnson v. Louisiana*, 406 U.S. 356 at 365, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972); *Green v. United States*, 386 F.2d 953 (10th Cir. 1967); *United States v. Fike*, 449 F.2d 191 (5th Cir. 1972); and, Annot. 43 A.L.R.3d 385.

In the instant case, there was clearly no causal connection between any illegality in the initial detention or arrest of the defendants and the undersheriff's discovery of evidence giving rise to probable cause for lawful felony arrest. The subsequent search of the defendants and discovery of State's Exhibits Nos. 2 and 3 was therefore incident to a valid custodial arrest and not the result of the exploitation of any primary illegality. The exclusionary rule should not therefore be applied to these exhibits as fruit of the poisonous

tree. We therefore hold this proposition too to be without merit.

For the above and foregoing reasons, the judgments and sentences appealed from are, accordingly, *affirmed*.

BRETT, P. J., concurs in results.

BLISS, J., concurs.